MacLEOD *v.* UNITED STATES.

APPEAL FROM THE COURT OF CLAIMS.

No. 259. Argued April 25, 1913.—Decided June 10, 1913.

The local government of a conquered country being destroyed, the conqueror may set up its own authority and make rules and regulations for the conduct of temporary government, and to that end may collect taxes and duties to support the military authority and carry on operations incident to the occupation.

An occupation giving the right to the conqueror to exercise governmental authority must be not only invasion but also possession of the enemy's country.

Messages and papers of the Presidents may be referred to by the courts as matters of public history.

The military occupation by the United States, during and after the war with Spain, of the Philippine Islands, and the conduct of the military government thereof, did not extend to places which were not in actual possession of the United States, until they were reduced to such possession.

Executive orders regarding the collection of duties on goods imported into the Philippine Islands during the military occupancy thereof by the United States did not apply to any ports, such as Cebu, during the time that they were not in the possession and under the control of the United States.

The principles of international law were recognized by the Executive in issuing orders concerning the government of the Philippine Islands during military occupancy thereof, and this court will not construe an order directing payment of duties on imports as relating to goods brought into ports in the possession of the *de facto* government of the insurgents.

The fact that the importer of goods brought into a port of the Philippine Islands which had not been reduced to possession by the United States but was still under control of a *de facto* government of the insurgents resided in Manila which was under military occupancy did not make him subject to the executive order of July 12, 1898, to pay duties on such goods.

A state of war, as to third persons, continued during and after the war with Spain until the ratification of the treaty of peace.

The act of June 30, 1906, c. 3912, 34 Stat. 636, ratifying executive acts imposing duties, does not apply to duties collected at points which the United States had not occupied and which were in possession of insurgent *de facto* governments. *United States* v. *Heinszen*, 206 U. S. 370, distinguished.

Statutes relating to territory occupied by the military forces of the Government should be construed in the light of the purpose of the Government to act within the principles of international law, the observance of which is essential to the peace and harmony of nations.

Duties collected by the United States on cargoes imported at ports in the Philippine Islands which had not been reduced to possession by the United States but were in possession of the *de facto* government of insurgents were an illegal and unwarranted exaction covered neither by the order of the President nor the ratifying acts of Congress.

45 Ct. Cl. 339, reversed.

THE appellant, William Stewart MacLeod, surviving partner of MacLeod & Company, brought suit in the Court of Claims to recover from the United States the amount of certain duties paid by the firm under protest upon a cargo of rice imported into the Island of Cebu at the city and port of the same name, in the Philippine Islands, on January 29, 1899. The Court of Claims decided in favor of the United States and rendered judgment dismissing the petition. 45 Ct. Cls. 339. The case was then appealed to this court.

The Court of Claims made findings of fact, the substance of which is as follows:

The claimant firm, comprised of the appellant (the survivor) and two others, all citizens of Great Britain, had its head office at Manila and was engaged in doing a

general. mercantile business there and elsewhere in the
Orient. On January 13, 1899, the claimants chartered
an American steamship, the Venus, at Manila and cleared
her in ballast for Saigon, China, whence she sailed for the
port of Cebu with a cargo of rice on January 22nd, carry-
ing the usual consular papers. Prior to that time it had
been the practice of the military authorities at Manila
to require importers, residing in that city and shipping
rice to points in the Philippines not actually occupied by
the United States forces, to present certified manifests
covering their cargoes and to pay the duties thereon to
the United States military collector of customs at Manila,
which practice was a matter of common knowledge and
discussion among the business men in that city, but there
is no other evidence charging the claimants with knowl-
edge of the fact.

The collector at Manila was informed by competitors
of the claimants that the latter proposed to ship the cargo
to Cebu without paying duty at Manila and that, as they
complied with the requirements of the United States
authorities, they would be unable to compete, under such
unfair conditions, with the claimants; and the collector
received confirmation of such report from the consul at
Saigon on the twenty-first of January, and on the twenty-
third officially notified the claimants that a certified mani-
fest must be presented and duties paid on the cargo at the
custom house at Manila. The next day one of the claim-
ants presented in person to the collector a letter stating
that there had been no secret as to the movement of the
Venus; that she had been openly dispatched to Saigon to
load a cargo of rice for the Philippines, and that the captain
had instructions to secure consular papers, if ordered to
Cebu, in case that port should be in the possession of the
United States authorities upon his arrival, and that they
presumed his papers were in order; that according to
their advice Cebu was in the hands of the republican gov-

ernment, whose authorities would exact the payment of duties, the same in amount as under the Manila tariff; that in selling the cargo they had been required to guarantee that the duties would not exceed those under the Manila tariff; that the claimants protested against paying the duties twice, as it was through no fault of theirs that the duties went to the Cebu authorities, and that, desiring to respect the notification, they would, if instructed, request their Cebu friends to protest against the payment in Cebu because, according to the notification, the Cebu customs were under the control of the United States. At the same time the collector was informed that a ship of the claimants was about to leave Manila for Cebu, which would arrive in time to head off the Venus (which did in fact sail from Manila that day and arrived in Cebu before the Venus); that their intention in so advising the collector was that he might take the steps he thought most expedient, but that the claimants, unless otherwise ordered by the United States, intended to carry out their contract with the purchasers of the cargo, even if required to pay double duties.

Upon the arrival of the Venus at Cebu, January 29, 1899, the native government demanded the payment of duties on the cargo and refused to allow its discharge until such payment was made. On February 4, 1899, the duties were paid and the cargo delivered to the purchasers. Upon the arrival of the Venus thereafter at Manila, with a cargo from Cebu, she was at first prevented from discharging her cargo without paying the duties involved in this case, but later was permitted to do so. Subsequently the collector refused to receive further business from the claimants until the duties in question were paid, and because of such refusal and in order to transact further business with the collector, the claimants, involuntarily and under protest, paid the duties demanded.

War was declared with Spain on April 25, 1898, and on May 1, 1898, the forces of the United States captured Manila Bay and harbor. The following order of the President was thereafter promulgated:

"Executive Mansion, July 12, 1898.

"By virtue of the authority vested in me as Commander-in-Chief of the Army and Navy of the United States of America, I do hereby order and direct that upon the occupation and possession of any ports and places in the Philippine Islands by the forces of the United States the following tariff of duties and taxes, to be levied and collected as a military contribution, and regulations for the administration thereof, shall take effect and be in force in the ports and places so occupied.

"Questions arising under said tariff and regulations shall be decided by the general in command of the United States forces in those islands.

"Necessary and authorized expenses for the administration of said tariff and regulations shall be paid from the collections thereunder.

"Accurate accounts of collections and expenditures shall be kept and rendered to the Secretary of War.

"WILLIAM McKINLEY."

The protocol of August 12, 1898, provided that "The United States will occupy and hold the city, bay and harbor of Manila, pending the conclusion of a treaty of peace which shall determine the control, disposition and government of the Philippines." Manila was opened as a port of entry on August 20, 1898, and Cebu on March 14, 1899. The executive order of July 12, 1898, was not proclaimed in Cebu until February 22, 1899, or later. The treaty of peace was signed on December 10, 1898, but ratifications were not exchanged until April 11, 1899. The Spanish forces evacuated the Island of Cebu on December 25, 1898, having first appointed a provisional governor. Shortly thereafter the native inhabitants, formerly in insurrection

against Spain, took possession of the Island, formed a so-called republic and administered the affairs of the Island until possession was surrendered to the United States on February 22, 1899, prior to which time no authorities of the United States had been in the Island and the United States had not been in possession or occupation of the Island, it having been up to that time in the actual physical possession of the Spanish and the people of the Island.

*Mr. Barry Mohun* and *Mr. L. T. Michener*, with whom *Mr. J. N. Wolfson* and *Mr. P. G. Michener* were on the brief, for appellant:

The court has jurisdiction. *Dooley* v. *United States*, 182 U. S. 222, 230; *Armstrong* v. *United States*, 182 U. S. 243.

The title of the United States to the Island of Cebu did not vest so far as the rights of individuals were concerned until the proclamation of the treaty of April 11, 1899. *Dooley* v. *United States*, 182 U. S. 222, 230; *Haver* v. *Yaker*, 9 Wall. 32.

The payment of duties by appellant to the *de facto* government in Cebu was lawful. *United States* v. *Rice*, 4 Wheat. 246, 253; *Coleman* v. *Tennessee*, 97 U. S. 536; *De-Lima* v. *Bidwell*, 182 U. S. 1, 184; *Downes* v. *Bidwell*, 182 U. S. 303; *Pearcy* v. *Stranahan*, 205 U. S. 257, 272; 1 Moore's Digest Int. Law, pp. 41 *et seq.*

The doctrine of the case of *United States* v. *Rice, supra,* has been uniformly recognized and enforced by the United States through its Department of State. *In Re Duties Collected at Mazatlan, Mexico,* 1 Wharton's Int. Law Dig., § 7, p. 29; *The Bluefields Case,* 1 Moore's Dig. Int. Law, pp. 49, 51.

The order of the President of July 12, 1898, could only be enforced at ports and places actually occupied by the military forces of the United States and was only ap-

plicable to imports made at such ports and places. *Lincoln* v. *United States*, 197 U. S. 419, 428; *DeLima* v. *Bidwell*, 182 U. S. 1, 199; Hall's Int. Law, 5th Ed., p. 448.

If there should be doubt as to the meaning of the Executive Order of July 12, 1898, it should be resolved in favor of appellant. *Hartranft* v. *Wiegmann*, 121 U. S. 609, 616; *American Net & Twine Co.* v. *Worthington*, 141 U. S. 468, 474.

The temporary allegiance owed by appellant to the United States as conqueror in possession of Manila did not justify the exaction of these moneys from him as duties upon an importation into Cebu.

The military commander at Manila while above the laws of the Philippine Islands was not above the laws of his own country, *Dooley* v. *United States*, 182 U. S. 222, 234, and was further restricted by the order of the President dated July 12, 1898, which was in accordance with the rules of International Law. *United States* v. *Rice*, *supra;* Hall's Int. Law, 5th Ed., *supra.*

The ratification act of June 30, 1906, 34 Stat. 636, is not applicable to this case. *United States* v. *Heinszen & Co.*, 206 U. S. 370; *Dooley* v. *United States, supra; Fourteen Diamond Rings* v. *United States*, 183 U. S. 176; *Warner, Barnes & Co., Ltd.*, v. *United States*, 197 U. S. 419; on re-hearing 202 U. S. 484; *The Charming Betsy*, 2 Cranch, 64, 118, The Hague Convention, 32 Stat. 1803–1826. See Article 42.

The legislative history of the ratification act negatives an intention on the part of Congress to have ratified this collection. Senate Bill, 6362, 59th Cong. 1st Sess.

*Mr. Frederick De C. Faust*, Acting Assistant Attorney General, for the United States:

The collection of the duties in question at Manila was a valid and lawful exercise of the war power vested in the

military commander of the United States forces in the Philippine Islands.

The general right of a military commander, under the war power, to govern territory of the enemy after its conquest and prior to the ratification of a treaty of peace is not open to question. *Cross* v. *Harrison,* 16 How. 164; *Dooley* v. *United States,* 182 U. S. 222; *De Lima* v. *Bidwell,* 182 U. S. 1; *Fourteen Diamond Rings,* 183 U. S. 176.

The conquering power has the right to displace the preëxisting authority and to assume to such extent as it may deem proper the exercise by itself of all the powers and functions of government. There is no limit to the powers that may be exerted in such cases save those which are found in the laws and usages of war. These principles have the sanction of all publicists who have considered the subject. *New Orleans* v. *Steamship Company,* 20 Wall. 387, 394. See also *Thirty Hogsheads of Sugar* v. *Boyle,* 9 Cr. 191; *Fleming* v. *Page,* 9 How. 603; *American Ins. Co.* v. *Canter,* 1 Pet. 511.

It is conceded that the military forces of the United States did not take actual possession of the island of Cebu until after the first payment of the duties had been made to the native insurgents, but that fact does not affect the point at issue in this case.

The question here is as to the right of the military commander, under the war power, to prescribe rules and regulations governing importations of merchandise, not by inhabitants of Cebu, but by residents of Manila, claiming the protection of the United States, into the enemy's territory.

While it is true that the treaty of peace between the United States and Spain was signed December 10, 1898, the war did not cease nor title to the Island of Cebu vest in the United States, in so far as the rights of third parties were affected, until the exchange of ratifications on the

eleventh of April, 1899. *Haver* v. *Yaker*, 9 Wall. 32; *Dooley* v. *United States*, 182 U. S. 222.

Until such ratification the Island of Cebu continued to be hostile territory, and all commercial intercourse between its inhabitants and the inhabitants of Manila, then under military occupation of the United States, was prohibited by the rules of international law. Wheaton's Int. Law, 422; *Montgomery* v. *United States*, 15 Wall. 395.

The only recognized belligerents in the Philippine Islands, prior to the ratification of the treaty, were the United States and Spain.

Appellants landed their cargo and paid the alleged duties demanded by the native inhabitants of Cebu at their peril, well knowing that duties in the same amount would be exacted thereon by the military authorities at Manila. *United States* v. *Rice*, 4 Wheat. 246, 255, upon which appellants rely, directly supports the Government's contention in this case.

The importers were residents, not of the island of Cebu, but of the city of Manila, conducting their business under the protection of the United States military authorities. Their obligation to comply with the law was due, therefore, not to the Kingdom of Spain nor to the rebellious natives of Cebu, but to the United States. As to the executive order of July 12, 1898, see *Lincoln* v. *United States*, 202 U. S. 499.

Any doubt that might possibly exist as to the authority of the military collector at Manila to collect the duties here in question is completely removed by the terms of the ratification act of June 30, 1906. See *United States* v. *Heinszen*, 206 U. S. 381.

Mr. Justice Day, after making the foregoing statement, delivered the opinion of the court.

When the Spanish fleet was destroyed at Manila, May 1, 1898, it became apparent that the Government of the

United States might be required to take the necessary steps to make provision for the government and control of such part of the Philippines as might come into the military occupation of the forces of the United States. The right to thus occupy an enemy's country and temporarily provide for its government has been recognized by previous action of the executive authority and sanctioned by frequent decisions of this court. The local government being destroyed, the conqueror may set up its own authority and make rules and regulations for the conduct of temporary government, and to that end may collect taxes and duties to support the military authority and carry on operations incident to the occupation. Such was the course of the Government with respect to the territory acquired by conquest and afterwards ceded by the Mexican Government to the United States. *Cross v. Harrison,* 16 How. 164. See also in this connection, *Fleming v. Page,* 9 How. 603; *New Orleans v. Steamship Co.,* 20 Wall. 387; *Dooley v. United States,* 182 U. S. 222; 7 Moore's International Law Digest, §§ 1143 *et seq.,* in which the history of this Government's action following the Mexican War and during and after the Spanish-American War is fully set forth: and also Taylor on International Public Law, chapter IX, Military Occupation and Administration, §§ 568 *et seq.,* and 2 Oppenheim on International Law, §§ 166 *et seq.*

There has been considerable discussion in the cases and in works of authoritative writers upon the subject of what constitutes an occupation which will give the right to exercise governmental authority. Such occupation is not merely invasion, but is invasion plus possession of the enemy's country for the purpose of holding it temporarily at least. 2 Oppenheim, § 167. What should constitute military occupation was one of the matters before The Hague Convention in 1899 respecting laws and customs of war on land, and the following articles were adopted

by the nations giving adherence to that Convention, among which is the United States (32 Stat. II, 1821):

"Article XLII.  Territory is considered occupied when it is actually placed under the authority of the hostile army.

"The occupation applies only to the territory where such authority is established, and in a position to assert itself.

"Article XLIII.  The authority of the legitimate power having actually passed into the hands of the occupant, the latter shall take all steps in his power to re-establish and insure, as far as possible, public order and safety, while respecting, unless absolutely prevented, the laws in force in the country."

A reference to the Messages and Papers of the Presidents, to which we may refer as matters of public history, shows that the President was sensible of and disposed to conform the activities of our Government to the principles of international law and practice.  See 10 Messages and Papers of the Presidents, 208, executive order of the President to the Secretary of War, in which the President said (p. 210):

"While it is held to be the right of a conqueror to levy contributions upon the enemy in their seaports, towns, or provinces which may be in his military possession by Conquest, and to apply the proceeds to defray the expenses of the war, this right is to be exercised within such limitations that it may not savor of confiscation. As the result of military occupation the taxes and duties payable by the inhabitants to the former government become payable to the military occupant, unless he sees fit to substitute for them other rates or modes of contributions to the expenses of the government.  The moneys so collected are to be used for the purpose of paying the expenses of government under the military occupation, such as the salaries of the judges and the police, and for the payment of the expenses of the army."

To the same effect, executive order of the President to the Secretary of the Treasury, in which the President said (p. 211):

"I have determined to order that all ports or places in the Philippines which may be in the actual possession of our land and naval forces by conquest shall be opened, while our military occupation may continue, to the commerce of all neutral nations, as well as our own, in articles not contraband of war, upon payment of the rates of duty which may be in force at the time when the goods are imported."

And the like executive order of the President to the Secretary of the Navy (p. 212).

In pursuance of this policy, the order of July 12, 1898, was framed. By its plain terms the President orders and directs the collection of tariff duties at ports in the occupation and possession of the forces of the United States. More than this would not have been consistent with the principles of international law, nor with the practice of this Government in like cases. While the subsequent order of December 21, 1898, made after the signing of the treaty of peace, is referred to in the brief of counsel for the Government, it was not alluded to in the findings of fact of the Court of Claims; but we find nothing in that order indicating a change of policy in respect to the collection of duties. While the signing of the treaty of peace between the United States and Spain on December 10, 1898, was stated, the responsible obligations imposed upon the United States by reason thereof were recited and acknowledged and the necessity of extending the government with all possible dispatch to the whole of the ceded territory was emphasized, no disposition was shown to enlarge the number of ports and places in the Philippine Islands at which duties should be collected so as to include those not occupied by the United States, and the President said (p. 220):

"All ports and places in the Philippine Islands in the actual possession of the land and naval forces of the United States will be opened to the commerce of all friendly nations. All goods and wares not prohibited for military reasons, by due announcement of the military authority, will be admitted upon payment of such duties and other charges as shall be in force at the time of their importation."

The occupation by the United States of the city, bay and harbor of Manila pending the conclusion of a treaty which should determine the control, disposition and government of the Philippines was provided for by the protocol of August 12, 1898, and the necessity of further occupation, until the exchange of ratifications by the Government of Spain and the United States, was recognized by the President in the order of December 21, 1898. We have been unable to find anything in the executive or congressional action prior to the importation of the cargo now in question having the effect to extend the executive order as to the collection of duties during the military occupation to ports and places not within the occupation and control of the United States.

The statement of the facts shows that the insurgent government was in actual possession of the custom-house at Cebu, with power to enforce the collection of duties there, as it did. Such government was of the class of *de facto* governments described in 1 Moore's International Law Digest, § 20, as follows:

"But there is another description of government, called also by publicists a government *de facto*, but which might, perhaps, be more aptly denominated a government of paramount force. Its distinguishing characteristics are (1) that its existence is maintained by active military power within the territories, and against the rightful authority of an established and lawful government; and (2) that while it exists it must necessarily be

obeyed in civil matters by private citizens who, by acts of obedience rendered in submission to such force, do not become responsible, as wrongdoers, for those acts, though not warranted by the laws of the rightful government. Actual governments of this sort are established over districts differing greatly in extent and conditions. They are usually administered directly by military authority, but they may be administered, also, by civil authority, supported more or less directly by military force." *Thornington* v. *Smith*, 8 Wall. 1, 9.

The attitude of this Government toward such *de facto* governments was evidenced in the Bluefields case, a full account of which is given in 1 Moore's International Law Digest, pp. 49 *et seq.* In that case General Reyes had headed an insurrectionary movement at Bluefields and acquired actual control of the Mosquito Territory in Nicaragua. His control continued for a short time only, February 3 to February 25, 1899, and after the reëstablishment of the Nicaraguan Government at Bluefields it demanded of American merchants the payment to it of certain amounts of duty which they had been compelled to pay to the insurgent authorities during the period of their *de facto* control. The American Government remonstrated, and the duties demanded by the Nicaraguan Government were by agreement deposited in the British consulate pending a settlement of the controversy. The Department of State of the United States, upon receiving sworn statements of the American merchants to the effect that they were not accomplices of Reyes, that the money actually exacted was the amount due on bonds which then matured for duties levied in December, 1898, payments being made to the agent of the titular government who was continued in office by General Reyes, that payment was demanded under threat of suspension of importations, and that from February 3 to February 25 General Reyes was in full control of the civil and mili-

tary agencies in the district, expressed the opinion that
to exact the second payment would be an act of inter-
national injustice; and the money was finally returned
to the American merchants with the assent of the Govern-
ment of Nicaragua.

A similar case appears in 1 Moore's International Di-
gest, p. 49, in which our Government was requested by
Great Britain to use its good offices to prevent the exac-
tion by the Mexican Government of certain duties at
Mazatlan, which had been previously paid to insurgents.
The then Secretary of State, Mr. Fish, instructed our
Minister to Mexico as follows:

"It is difficult to understand upon what ground of
equity or public law such duties can be claimed. . The
obligation of obedience to a government at a particular
place in a country may be regarded as suspended, at
least, when its authority is usurped, and is due to the
usurpers if they choose to exercise it. To require a re-
payment of duties in such cases is tantamount to the
exaction of a penalty on the misfortune, if it may be so
called, of remaining and carrying on business in a port
where the authority of the government had been annulled.
The pretension is analogous to that upon which vessels
have been captured and condemned upon a charge of
violating a blockade of a port set on foot by a proclama-
tion only, without force to carry it into effect."

See also Colombian Controversy, 6 Moore's Interna-
tional Law Digest, pp. 995 et seq.

While differing somewhat in its circumstances, the case
of *United States* v. *Rice*, 4 Wheat. 246, is an instructive
case. In that case, during the War of 1812, the port of
Castine, Maine, was captured by the British forces and
during its occupation the British Government exercised
civil and military authority over the people, established
custom-houses and collected duties on goods. After
peace and the reëstablishment of the American Govern-

ment at Castine the collector of customs claimed the right to collect duties upon the goods, and this court held that the duties could not be collected a second time. Mr. Justice Story, delivering the opinion of the court, after stating that the British Government was in full control of the port and authorized to collect duties, said (p. 254):

"Castine was, therefore, during this period, so far as respected our revenue laws, to be deemed a foreign port; and goods imported into it by the inhabitants, were subject to such duties only as the British Government chose to require. Such goods were, in no correct sense, imported into the United States. The subsequent evacuation by the enemy, and resumption of authority by the United States, did not, and could not, change the character of the previous transactions. The doctrine respecting the *jus postliminii* are wholly inapplicable to the case. The goods were liable to American duties, when imported, or not at all. That they were not so liable at the time of importation, is clear from what has been already stated; and when, upon the return of peace, the jurisdiction of the United States was reassumed, they were in the same predicament as they would have been if Castine had been a foreign territory ceded by treaty to the United States, and the goods had been previously imported there. In the latter case, there would be no pretence to say that American duties could be demanded; and, upon principles of public or municipal law, the cases are not distinguishable. The authorities cited at the bar would, if there were any doubt, be decisive of the question. But we think it too clear to require any aid from authority."

We observe that the learned justice puts the case of the importation of goods into a foreign territory afterwards ceded to the United States as one which under no pretense would afford an authority to collect duties upon goods previously imported there. We do not think that it was

the purpose of the executive order under which the government at Manila was instituted and maintained at the time of this importation to direct the collection of duties at ports not in the occupation of the United States, and certainly not at one actually in the possession of a *de facto* government, as is shown in this case.

It is said, however, that the claimants resided and were doing business at Manila and therefore were subject to the military authority there, and the authority of a conquering power, recognized in *New Orleans* v. *Steamship Company, supra,* 394, to regulate trade with the enemy and in its country is cited in support of the proposition. That there is such general authority, there can be no doubt. It is, however, not without limitation, and a local commander is certainly bound by the orders of the President as commander in chief, which in this case had limited tariff collections to ports and places occupied by the United States. And such authority is subject to the laws and usages of war (*New Orleans* v. *Steamship Co., supra,* p. 394) and, we may add, to such rules as are sanctioned by established principles of international law.

A state of war as to third persons continued until the exchange of treaty ratifications (*Dooley* v. *United States,* 182 U. S. 222, 230), and, although rice, not being contraband of war, might have been imported (7 Moore's International Law Dig., pp. 683, 684), the authority of the military commander, until the exchange of ratifications, may have included the right to control vessels sailing from Manila to trade in the enemy's country and to penalize violations of orders in that respect. But whatever the authority of the commander at Manila or those acting under his direction to control shipments by persons trading at Manila and in vessels sailing from there of American registration, such authority did not extend to the second collection of duties upon a cargo from a foreign port to a port occupied by a *de facto* government

which had compulsorily required the payment of like duties.

It is further contended that, if the collection of duties was originally without authority, it was ratified by the act of June 30, 1906 (34 Stat. 634, 636, c. 3912), which provides:

"That the tariff duties both import and export imposed by the authorities of the United States or of the provisional military government thereof in the Philippine Islands prior to March eighth, nineteen hundred and two, at all ports and places in said islands upon all goods, wares, and merchandise imported into said islands from the United States, or from foreign countries, or exported from said islands, are hereby legalized and ratified, and the collection of all such duties prior to March eighth, nineteen hundred and two, is hereby legalized and ratified and confirmed as fully to all intents and purposes as if the same had by prior act of Congress been specifically authorized and directed."

The history of this act and others growing out of the Spanish-American War is fully set forth in *United States* v. *Heinszen & Co.*, 206 U. S. 370. This court had held that the President had no authority to order the imposition of duties subsequent to the ratification of the treaty, with reference to Porto Rico (*Dooley* v. *United States, supra*), and with reference to the Philippine Islands (*Fourteen Diamond Rings* v. *United States*, 183 U. S. 176). The act of July 1, 1902 (32 Stat. 691, c. 1369), was then passed by Congress, ratifying the action of the President in making the order of July 12, 1898, whereby duties had been collected at "all ports and places in the Philippine Islands upon passing into the occupation and possession of the forces of the United States," and amendments of that order, and ratifying such action of the authorities in the Philippines as was done in accordance with the orders of the President. In *Lincoln* v. *United States*, and

*Warner, Barnes & Co., Ltd.,* v. *United States,* 197 U. S.
419, affirmed on rehearing in 202 U. S. 484, the act of
July 1, 1902, was construed to apply only to duties col-
lected prior to April 11, 1899 (when the treaty became
effective). In this situation, the month following the
decision of this court in 202 U. S. 484, *supra* (affirming
the *Lincoln* and *Warner, Barnes & Co., Ltd., cases*) Con-
gress passed the ratifying act now in question. *United
States* v. *Heinszen & Co., supra,* 381.

Conceding that the act is broad enough in terms to
cover tariff duties exacted under the authority of the
President's orders before the ratification of the treaty,
it is expressly limited to tariff duties, import and export,
imposed by the authorities of the United States and of the
provisional government of the Islands prior to March 8,
1902 (the date of the act of Congress temporarily pro-
viding revenue for the Philippine Islands, 32 Stat. 54,
c. 140); and there is no expression of purpose in the stat-
ute to enlarge the executive orders of the President, which
limited the collection of duties during our military occu-
pation to ports and places actually held and occupied
by the forces of the United States, or to ratify collections
made where goods had been entered at a port not under
American control and in possession of a *de facto* insurrec-
tionary government, as is here shown.

The statute should be construed in the light of the pur-
pose of the Government to act within the limitation of
the principles of international law, the observance of
which is so essential to the peace and harmony of nations,
and it should not be assumed that Congress proposed to
violate the obligations of this country to other nations,
which it was the manifest purpose of the President to
scrupulously observe and which were founded upon the
principles of international law.

The act has the scope given to it in the case of *United
States* v. *Heinszen & Co.,* 206 U. S. 370, namely, to ratify

"the collection of the duties levied under the order of the President," which, as we have seen, were tariff duties imposed at ports in the occupation and possession of the United States. The tariff duties upon the cargo of rice here in question were paid to the *de facto* authorities at Cebu, where the cargo was entered, and the payment made at Manila was not a tariff duty but an illegal and unwarranted exaction in the nature of a penalty, covered by neither the orders of the President nor the ratifying acts of Congress.

We think the Court of Claims was in error in holding the duties collectible at Manila under the circumstances related, and in adjudging that the act of June 30, 1906, ratified the conduct of the military authorities at Manila in compelling such payment. Its judgment will therefore be reversed and the case remanded to the Court of Claims with instructions to enter judgment for the claimant.

*Reversed.*