PETROGRADSKY MEJDUNARODNY KOMMERCHESKY BANK, Appellant, *v.* THE NATIONAL CITY BANK OF NEW YORK, Respondent.

24

(Argued January 13, 1930; decided February 11, 1930.)

*Frederick B. Campbell* and *Paul C. Whipp* for appellant. The courts of the State of New York should not refuse to take jurisdiction of this action at law to recover a debt. (*Bank of British North America* v. *Merchants Nat. Bank*, 91 N. Y. 106; *Crawford* v. *West Side Bank*, 100 N. Y. 50; *Shipman* v. *Bank of State of New York*, 126 N. Y. 318; *Baldwin's Bank* v. *Smith*, 215 N. Y. 76; *Ætna Nat. Bank* v. *Fourth Nat. Bank*, 46 N. Y. 82; *Erb* v. *Banco Di Napoli*, 243 N. Y. 45; *Citizens Nat. Bank* v. *Importers & Traders Bank*, 119 N. Y. 195; *Banque de France* v. *Equitable Trust Co.*, 33 Fed. Rep. [2d] 202; *Joint Stock Co.* v. *National City Bank*, 240 N. Y. 368; *Sliosberg* v. *New York Life Ins. Co.*, 244 N. Y. 482; *Coler* v. *Corn Exchange Bank*, 250 N. Y. 136; *Newhall* v. *Longacre Bank*, 248 N. Y. 252; *Scheffer* v. *Erie County Savings Bank*, 229 N. Y. 50; The defendants plea of possible double liability is without

substance. (*Banque Internationale de Commerce de Petrograd* v. *Goukassow*, L. R. [1925] App. Cas. 150; *Russian Commercial & Industrial Bank* v. *Comptoir d' Escompte de Mulhouse*, L. R. [1925] App. Cas. 112; *Employers Liability Assurance Corp., Ltd.,* v. *Sedgwick*, L. R. [1927] App. Cas. 95; *Sokoloff* v. *National City Bank*, 239 N. Y. 158.) The plaintiff exists and may maintain this action. (*Matter of Huss*, 126 N. Y. 537; *People* v. *President & Directors of Manhattan Co.,* 9 Wend. 351; *Russian Commercial & Industrial Bank* v. *Comptoir d' Escompte de Mulhouse,* L. R. [1925] App. Cas. 112; *Banque Internationale de Commerce de Petrograd* v. *Goukassow*, L. R. [1925] App. Cas. 150; *Employers Liability Assurance Corp., Ltd.,* v. *Sedgwick, Collins & Co.,* L. R. [1927] App. Cas. 95; *First Russian Ins. Co.* v. *London & Lancashire Ins. Co., Ltd.,* L. R. [1928] Ch. Div. 922; *James & Co.* v. *Rossia Ins. Co.,* 247 N. Y. 262; *First Russian Ins. Co.* v. *Stoddard*, 240 N. Y. 601; *Moscow Machine Tool & Engine Co.* v. *Richard & Co.,* 240 N. Y. 707; *Joint Stock Co.* v. *National City Bank*, 210 App. Div. 665; *Sokoloff* v. *National City Bank*, 250 N. Y. 69.) The plaintiff's directors had the requisite authority to institute this action. (*Matter of Second Russian Ins. Co.,* 250 N. Y. 449; *James & Co.* v. *Rossia Ins. Co.,* 247 N. Y. 262; *First Russian Ins. Co.* v. *Beha*, 240 N. Y. 601; *Russian Reinsurance Co.* v. *Stoddard*, 240 N. Y. 149; *Beers* v. *N. Y. Life Ins. Co.,* 66 Hun, 75; *Townsley* v. *Niagara Life Ins. Co.,* 160 App. Div. 178; 218 N. Y. 228.)

*Carl A. Mead* and *Justus Sheffield* for respondent. Plaintiff has no right in our courts since the rule of comity does not apply to plaintiff. (*Demarest* v. *Flack*, 128 N. Y. 205; *Russian Republic* v. *Cibrario*, 235 N. Y. 255; *Sliosberg* v. *N. Y. Life Ins. Co.,* 244 N. Y. 482; *Bank of Augusta* v. *Earle*, 13 Pet. 519; *Russian Reinsurance Co.* v. *Stoddard*, 240 N. Y. 149.) The plaintiff's corporate powers and the lawful method of exercising them are

determined by imperial Russian law. (*Demarest* v. *Flack*, 128 N. Y. 205; *Martyne* v. *American Union Fire Ins. Co.*, 216 N. Y. 183; *Russian Reinsurance Co.* v. *Stoddard*, 240 N. Y. 149; *Sliosberg* v. *N. Y. Life Ins. Co.*, 244 N. Y. 482; *Bank of Augusta* v. *Earle*, 13 Pet. 519; *Southworth* v. *Morgan*, 205 N. Y. 293; *Croker* v. *Croker*, 252 N. Y. 24; *Electric Fireproofing Co.* v. *Smith*, 113 App. Div. 615; *Fitzpatrick* v. *International Ry. Co.*, 252 N. Y. 127; *Electric Welding Co.* v. *Prince*, 200 Mass. 386; *Hite* v. *Keane*, 149 Wis. 207.) Plaintiff cannot bring this action, since its corporate existence had terminated before the action was begun. (*First Russian Ins. Co.* v. *Beha*, 240 N. Y. 601; *Matter of Beha* [*Second Russian Ins. Co.*], 215 App. Div. 796; 243 N. Y. 524; *Wulfsohn* v. *Russian Republic*, 234 N. Y. 372; *Sokoloff* v. *National City Bank*, 239 N. Y. 158; *Russian Reinsurance Co.* v. *Stoddard*, 240 N. Y. 149; *Banque de France* v. *Equitable Trust Co.*, 33 Fed. Rep. [2d] 202; *United States* v. *Palmer*, 3 Wheat. 610; *McCulloch* v. *Norwood*, 58 N. Y. 562; *People* v. *Knickerbocker Life Ins. Co.*, 106 N. Y. 619; *Rodgers* v. *Adriatic Fire Ins. Co.*, 148 N. Y. 34; *Pendleton* v. *Russell*, 144 U. S. 640.) The terms of the plaintiff's former directors having expired, they had no authority to bring this action. (Story on Agency, § 141; *Drummond* v. *Wood*, 2 Caines, 310; *Joslin* v. *Cowee*, 52 N. Y. 90; *Harter* v. *Blanchard*, 64 Barb. 617.) Possible double liability is a complete equitable defense. (*Crary* v. *Goodman*, 12 N. Y. 266; *Chase* v. *Peak*, 21 N. Y. 581; *New York Central Ins. Co.* v. *National Ins. Co.*, 14 N. Y. 85; *Hoppough* v. *Struble*, 60 N. Y. 430; *Glacken* v. *Brown*, 39 Hun, 294; *James* v. *Second Russian Ins. Co.*, 239 N. Y. 248; *Murphy* v. *Second Russian Ins. Co.*, 240 N. Y. 554; *Russian Republic* v. *Cibrario*, 235 N. Y. 255.)

CARDOZO, Ch. J. The plaintiff, a Russian bank, chartered in 1869 by the Imperial Russian Government, has deposit accounts with the defendant, opened in 1911

and 1915, with a balance of $66,749.45 to its credit at the trial.

Following the Soviet revolution of November, 1917, the assets of the bank in Russia were seized by the revolutionary government, and the directors driven into exile. By decrees of the Russian Soviet Republic in 1917, the bank was declared to be merged in the People's or State Bank, its assets were confiscated, its liabilities canceled, and its shares extinguished, and by a later decree, in January, 1920, the People's or State Bank was itself abolished, a banking system having been found to be unnecessary to the new economic life.

The terms of the plaintiff's charter or " statutes " are printed in the record. The governing body was to be a directorate consisting of seven members, of whom three were to form a quorum. One of the directors lost his life in the revolution. The other six made their way to Paris, where they held meetings from time to time, and did such business as they could. All six were alive in October, 1925, when this action was begun. Three have since died, but a quorum, three, survive.

At the time of the revolution the bank had assets of large value outside the territorial limits of the Soviet Republic. The refugee directors have sought and are still seeking to bring these assets together at their present domicile in Paris. Branch banks were in existence in London, Paris, Brussels and Geneva. The assets in these branches, with the exception of those in Geneva, have been paid to the directors, and are held in the name of the bank to be distributed hereafter as justice may require. At times the payments have been voluntary, and at times in obedience to judgments of the courts. In fulfilment of the same policy, the directors have attempted to collect the balance on deposit with the defendant in New York. They requested payment, but the defendant declined to recognize their authority. They presented a check, signed by directors who had been accredited in

former years as competent to draw, but the check was dishonored. In this action, which followed, the defendant insists: (1) That the plaintiff corporation has been dissolved and is no longer a juristic person; (2) that if it be a juristic person, its former directors are without authority to speak for it; and (3) that the court, in any event, should decline jurisdiction since a judgment for the plaintiff will leave the defendant unprotected against the danger of conflicting claims. The Trial Term gave judgment in favor of the defendant, and the Appellate Division unanimously affirmed.

(1) We think the plaintiff is not dissolved, but is still a juristic person with capacity to sue.

The decrees of the Soviet Republic nationalizing the Russian banks are not law in the United States, nor recognized as law (*Sokoloff* v. *National City Bank*, 239 N. Y. 158; *James & Co.* v. *Second Russian Ins. Co.*, 239 N. Y. 248; *Russian Reinsurance Co.* v. *Stoddard*, 240 N. Y. 149). They are exhibitions of power. They are not pronouncements of authority. "Acts or decrees, to be ranked as governmental, must proceed from some authority recognized as a government *de facto* " (*Sokoloff* v. *National City Bank, supra*, p. 166). Exhibitions of power may be followed or attended by physical changes, legal or illegal. These we do not ignore, however lawless their origin, in any survey of the legal scene. They are a source at times of new rights and liabilities. *Ex facto jus oritur*. Exhibitions of power may couple the physical change with declarations of the jural consequences. These last we ignore, if the consequences, apart from the declaration, do not follow from the change itself (cf. *Russian Reinsurance Co.* v. *Stoddard, supra*). There may be exceptions to this as there are to most principles of equal generality. If so, it is only when " violence to fundamental principles of justice or to our own public policy might otherwise be done " (*Sokoloff* v. *National City Bank, supra*, p. 166). The every-day transactions of business

or domestic life are not subject to impeachment, though the form may have been regulated by the command of the usurping government (*Sokoloff* v. *National City Bank*, supra, p. 165; *James & Co.* v. *Second Russian Ins. Co.*, supra; *MacLeod* v. *United States*, 229 U. S. 416, 428; *Baldy* v. *Hunter*, 171 U. S. 388; Connick, The Effect of Soviet Decrees in American Courts, 34 Yale L. J. 499, 506). To undo them would bring hardship or confusion to the helpless and the innocent without compensating benefit. On the other hand, there is no shelter in such exceptions for rapine or oppression. We do not recognize the decrees of Soviet Russia as competent to divest the plaintiff of the title to any assets that would otherwise have the protection of our law. At least this must be so where the title thus divested is transferred to the very government not recognized as existent. For the same reason we do not admit their competence in aid of a like purpose to pass sentence of death on the expropriated owner. Death, if it has followed, is not death by act of law (Hervey, The Legal Effects of Recognition in International Law, passim, 38 Harv. L. Rev. 818, 822; cf. Noel-Henry, Les Gouvernements de Fait devant le Juge, pp. 98, 107, 108).

In saying this we assume, though we are not required to decide, that the decrees were intended to extinguish the life of the nationalized banks, and not merely to strip them of ownership or usufruct (cf., however, *Russian C. & I. Bank* v. *Comptoir d' Escompte de Mulhouse*, [1925] App. Cas. 112; *Banque, etc.*, v. *Goukassow*, [1925] App. Cas. 150; *Employers' Liability Assur. Corp., Ltd.*, v. *Sedgwick & Co.*, [1927] App. Cas. 95; Wohl, Nationalization of Joint Stock Banking Corporations in Soviet Russia, 75 U. of Penn. L. Rev. 385, 386, 392, 395, with references to decisions in France and Germany). Even so, the jural consequence of dissolution will not follow from what was said unless, though nothing had been said, it would result from what was done. The dissolution of the banks was not " mere

ordinary legislation, such as might have been had there been no war " ( *United States* v. *Insurance Companies*, 22 Wall. [U. S.] 99, 103), but legislation closely interwoven with the overthrow of the old order and the creation of a new one. These and like circumstances have a bearing on the meed of recognition that is due in foreign lands. There is a distinction not to be ignored between the life of a human being and the life of a *persona ficta*, the creature of the State. When a human being dies, his death is equally a fact whether it is brought about legally or illegally, whether he has died of illness in his bed or has been murdered on the highway. The event is not conditioned by the juristic quality of the cause. But in respect of juristic beings, the quality of the cause may determine the event as well. The personality created by law may continue unimpaired until law rather than might shall declare it at an end. Conceivably, the law *will* declare it at an end when marauders have brought frustration to the purpose for which personality was given. That is another question. What is not to be lost sight of is that even so it is the law and not merely an assassin that must pronounce the words of doom.

Putting aside, then, as irrelevant the fiat of the Soviet Government that the jural consequence shall be death, we are brought to the question whether the law of the Imperial Government of Russia or of the later Provisional Government would have ascribed the consequence of death to the supervening changes irrespective of the fiat. These changes in briefest summary are the loss of the Russian assets, the dispersion of the stockholders, and the exclusion of the directors as well as all subordinate agents from the soil of the old empire.

An answer to that question leads us to the contentious problem of the origin and nature of juristic personality. The theories, broadly speaking, are two, though subject to many variations within the main lines. The one is the concession theory, by which corporate personality is invariably the gift and creature of the State (Holdsworth,

History of English Law, vol. 9, p. 48; Kohler, Philosophy of Law, Modern Legal Philosophy Series, p. 68; Dewey, The Historic Background of Corporate Legal Personality, 35 Yale L. J. 655). "Corporate life and form," says Holdsworth (*supra*), "cannot exist without the permission of the state, express, presumed, or implied." This is the prevailing theory in Anglo-American law, though rifts in its uniformity are visible here and there (cf. *United Mine Workers* v. *Coronado Coal Co.*, 259 U. S. 344, 385, 387). The other is the theory that even in the absence of a charter or other token of the will of government there are groups so natural and spontaneous as to evoke legal recognition of a corporate existence (Maitland, Introduction to Gierke's Political Theories of Middle Age; Pollock, Essays in the Law, p. 153; Laski, The Personality of Associations, 29 Harv. L. Rev. 404; Saleilles, De La Personnalité Juridique, passim; Roguin, Science Juridique Pure, vol. 2, pp. 434, 460, *et seq.;* Wise's Outlines of Jurisprudence [4th ed. by Oliver], p. 49). We are not advised by this record whether, by the law of Imperial Russia, the theory of a concession was exclusive of any other. Certain, however, it is that the theory was not unknown whether it be exclusive or concurrent. Here in this record are the legislative act and the charter or "statutes" formulated thereunder that bespeak the legislative gift. What the law itself has granted, the law must take away.

The corporation once existing, the burden was on the defendant to overthrow the presumption of continuance and to show that life had ceased (*Russian C. & I. Bank* v. *Comptoir d'Escompte de Mulhouse, supra; Matter of Huss*, 126 N. Y. 537, 542). We cannot say upon this record that the burden has been borne. If we look to the analogies of our own law, the conclusion is not doubtful. Neither bankruptcy (*Chemical Nat. Bank* v. *Hartford Dep. Co.*, 161 U. S. 1; *Brock* v. *Poor*, 216 N. Y. 387, 401), nor cessation of business (*Brock* v. *Poor, supra; Brooklyn Steam Transit*

*Co.* v. *City of Brooklyn,* 78 N. Y. 524, 529), nor dispersion of stockholders, nor the absence of directors (*Speer* v. *Colbert,* 200 U. S. 130, 144; *Brock* v. *Poor, supra*), nor all combined, will avail without more to stifle the breath of juristic personality. The corporation abides as an ideal creation, impervious to the shocks of these temporal vicissitudes. Not even the sequestration of the assets at the hands of a receiver will terminate its being (*Mann* v. *Pentz,* 3 N. Y. 415, 420; *Kincaid* v. *Dwinelle,* 59 N. Y. 548, 553; *Brock* v. *Poor, supra; Folger* v. *Columbia Ins. Co.,* 99 Mass. 267). "A corporation may by virtue of proceedings against it, or by reason of its pecuniary condition, cease to exist for all practical purposes, all the purposes for which it was created or for which a corporation may exist, but it cannot be held to be actually dissolved till so adjudged and determined, either by judicial sentence or the sovereign power" (*Kincaid* v. *Dwinelle, supra,* at p. 552). "The appointment of a receiver to take and distribute among the creditors and stockholders all the property of a corporation may with sufficient accuracy be called, as it was by Chancellor WALWORTH in *Verplanck* v. *Mercantile Ins. Co.* (2 Paige, 452), and *Bank Commissioners* v. *Bank of Buffalo* (6 Paige, 503), 'a virtual dissolution of the corporation;' but it does not extinguish its franchise, terminate its legal existence, or render it incapable of being sued, at law or in equity" (per GRAY, J., in *Folger* v. *Columbia Ins. Co., supra*). *A fortiori* must that be true if assets remain either in the domicile or elsewhere to be administered for the benefit of stockholders, known or unknown. In such a situation, there is no dissolution of any kind, either " virtual " or legal (*Kincaid* v. *Dwinelle, supra,* at p. 553; cf. *Russian C. & I. Bank* v. *Comptoir d'Escompte de Mulhouse, supra*). The corporate life in that event does not serve an expropriated being, but one endowed with worldly goods, and in need of capacities adequate to protect them. Survival follows in such circumstances from the very concept of a corporation as it

is known to our law. If there is anything in that concept at variance with the concept corporation as known to the law of Russia, the defendant, charged with the burden, has not informed us of the variance.

We are not unmindful of the witnesses who testified to an opinion that the plaintiff, as a result of all the changes it had experienced, was no longer a juristic person in the jurisdiction of its domicile. Their opinion, at least in part, was based on the assumption that the Soviet decrees were to be given the effect of law. It is not easy to disentangle what is left when that assumption is withdrawn. Prove, indeed, they did that the law of Imperial Russia would not suffer a bank to carry on the banking business while thus despoiled and crippled. This was far from proving that there would be a lack of corporate capacity to gather in the assets and repair the spoliation. In determining that capacity, we think away the physical impediments to the attainment of the corporate will, and ask, if these could be surmounted, whether the law would interpose new impediments of its own, would hold the struggle vain for want of a living victor to enjoy the tardy triumph. The statute does indeed prescribe that a bank shall be liquidated if it loses a quarter of its capital. The witnesses for the defendant concede that this provision does not execute itself and is unavailing *ipso facto* to terminate the corporate life. The statute prescribes visitation and control by the Minister of Finance. The witnesses for the defendant do not say that there is any law whereby the death of the Minister is the death of the corporations subject to his scrutiny. The statute prescribes the election of the directors on the expiration of their terms at the annual meeting of the shareholders. The witnesses do not say that the shareholders would be prohibited by anything in the pre-Soviet law from coming together now and choosing a new board. The statute prescribes by implication, or so we may assume, that the

directors shall meet at the principal office of the corporation, which in this instance was stated in the charter to be the city of Petrograd. The witnesses for the defendant do not point to any law whereby the directors would be without capacity to meet in Petrograd today if the new regime were overthrown or its vigilance eluded. The sum and substance of their testimony is this and nothing more, that through the exercise of power without authority of law there has been a paralysis of action within the confines of the territory where the power is still dominant. They have yet to show that as a consequence of this paralysis of action the very law that has been flouted multiplies the misfortunes of the victim by taking back also the concession of juristic life. One of the witnesses was asked whether the plaintiff would be without corporate capacity if the revolutionary government were to be destroyed tomorrow and the empire re-established. He answered that capacity would fail because a new statute would be necessary to annul the Soviet decree that had nationalized the banks. Here, as often, interwoven into the statement of opinion even when formally disclaimed, is the notion that the Soviet decrees have the authority of law. Abstract that notion, and the structure falls.

We are told from time to time in textbook and decision that a finding of foreign law is a finding of fact, to be reviewed in subjection to the same restraints that apply to the review of findings of fact generally. True, of course, it is that there is no judicial notice of the law of foreign lands. This does not mean, however, that the mere opinion of a witness will control the judgment of a judge except to the extent that it is a reasonable inference from statute or from precedent or from the implications of a legal concept, such as contract or testament or juristic personality (*Eastern Bldg. & Loan Assn.* v. *Williamson,* 189 U. S. 122, 127; *Finney* v. *Gay,* 189 U. S. 335, 342; *Bank of China, etc.,* v. *Morse,* 168 N. Y. 458, 470; *Fitz-*

*patrick* v. *International Ry. Co.*, 252 N. Y. 127, 138, 139). Unless it is this, the judge must use his own judgment and find the meaning of the foreign law as he would if the meaning to be ascertained were that of a deed or an agreement. This is as true upon appeal as it is upon a trial. At such times and for such inquiries, opinion has a significance proportioned to the sources that sustain it. Especially is that so where the problem to be solved is the measure of recognition that · is due under a given legal system to the acts of another system that professes to displace and supersede it. There is little in the practice or training peculiar to a Russian lawyer that enables him to speak as to such matters with any special measure of assurance or authority. In the absence of any precedents supplied by Russian history, the tests to be applied are those of international law as distinguished from any law that is municipal or local. The witnesses for the defendant believe that the corporation is no more, but the witness for the plaintiff believes that it survives. The fact is significant that there is no witness on either side who deduces his conclusion from any principle specifically Russian as to the continuance or destruction of juristic personality. Russian law is cited to show the rules that govern corporations during life. There is silence as to any rules for the ascertainment of the fact of death. In this conflict of opinion we are driven back upon the sources from which opinion must be derived if it is to have persuasion or validity. Statute and precedent and concept must be brought before the bar.

We find no statute or precedent that points with reasonable clarity to the conclusion that by the law of pre-Soviet Russia there has been an extinguishment of life as well as a suspension of activity. We find nothing in the Russian concept of juristic personality that leads to that conclusion, for there is nothing to show that the concept differs from our own. This being so, the presumption of continuance must tilt the balanced scales.

The corporation survives in such a sense and to such a degree that it may still be dealt with as a *persona* in lands where the decrees of the Soviet Republic are not recognized as law. We think there is no substantial basis in the evidence for an opinion to the contrary (*Matter of Case*, 214 N. Y. 199).

(2) The corporation surviving, the question must still be answered whether the former directors have authority to speak for it.

The concept of corporate personality is to be kept distinct in thought from that of authority or agency, though they are easily confused. It is one thing to say that there is still a corporation for whom directors, legally qualified, will be competent to act. It is another thing to say that directors, so qualified, exist.

The defendant insists that at least for two reasons the former directors are not qualified today to represent the plaintiff corporation by suing in its name, even if corporate personality be assumed to have continued. One is that the directors, though lawfully elected, were chosen for terms which have expired, and that there has been no re-election since the Soviet revolution. The other is that meetings should have been held in Petrograd and nowhere else.

Neither objection, in our view, is sufficient to disprove authority.

The witnesses for the defendant state that there is no rule of Russian law whereby, in default of an annual meeting, a director holds over until the choice of his successor. The plaintiff's witness says the contrary, and reinforces his opinion by the analogy of precedents in which the principle of holding over has been applied to fiduciaries of other kinds. One finds it incredible that automatically, upon the failure to hold a meeting of the shareholders before the expiration of the year at which an election is due, directors, not re-elected, are shorn of their powers, the corporation becoming a derelict with-

out managers to guide it. Such a thing does not seem possible in an enlightened legal system. Taking the defendant's witnesses at their word, they do not go so far as to maintain that this chaos would ensue. The directors in their view would not hold over in the capacity of directors, but would be charged, none the less, with a special obligation of conservation and protection. That is merely to say in other words that they are directors *de facto*, whatever the title of the office, since there is no one other than themselves on whom the duty to manage is imposed. We think their authority is sufficient in default of other representatives to permit them to sue in our courts in the name and for the benefit of the corporation they represent (*James & Co.* v. *Rossia Ins. Co.*, 247 N. Y. 262). In saying this we are not unmindful that the shareholders, the equitable owners of the assets, are dispersed and to some extent unknown. Some of them, however, are known, though the complete list was destroyed upon the seizure of the Russian office. Others, if now unknown, may, not impossibly, be identified or discovered through inquiry and advertisement, or other forms of constructive service. The charter of the bank provides that " upon the death of a shareholder, his rights pass to his heirs at law or his testamentary heirs, but in no case can a share be split." It will be for the courts of the French Republic, if the fund is sent to France, to devise and apply the process and the remedies that will insure an administration of the assets in conformity to justice.

What has been said as to the consequences of a failure to re-elect the directors may be said with little variation as to the failure of the directors to hold their meetings at the banking house in Petrograd. The witnesses for the defendant assert that there was no authority to meet elsewhere. The witness for the plaintiff states the contrary. We may assume for present purposes that the principal banking house in Russia was the proper place

of meeting, and that any director, not present, might refuse to be bound by action taken elsewhere (cf. *Ormsby* v. *Vermont Copper Mining Co.*, 56 N. Y. 623; *Matter of George* v. *Holstein-Friesian Assn.*, 238 N. Y. 513, 521). This does not mean of necessity that action might not be taken elsewhere by unanimous consent. Still less does it mean that action taken elsewhere by unanimous consent must be disregarded as a nullity if it was impossible by reason of *vis major* to hold the meeting at the home office. Fire, flood or earthquake, as well as insurrection, might threaten death or ruin. One finds it incredible that at such a time a board would be driven by law to abandon the corporation to spoliation and destruction because unable to meet in Petrograd, though able to come together in some other part of Russia or across the Russian border. Testimony much more explicit and persuasive than any offered by the defendant would be necessary in order to lead us to the acceptance of a conclusion so grotesque. There is no suggestion of any rule of Russian law that so obstructs and cripples the life preserving power in the face of present peril. At the very least, a resolution thus adopted would have the force to be attributed to the action of *de facto* managers, speaking and acting for the corporation in an emergency too urgent to wait upon formality.

(3) The possibility of adverse claims does not relieve the defendant from liability when sued in an action at law by a depositor who is successful in proving a title to the fund.

The defendant cites our decision in *Russian Reinsurance Co.* v. *Stoddard* (240 N. Y. 149, April, 1925), as supporting its defense. The ruling is inapplicable to the situation now before us. There the subject of the controversy was a fund deposited in a bank to be held as trustee for a Russian insurance company, its stockholders and creditors. The company made demand that the *res* be returned by the trustee upon the ground that the purposes of the deposit had failed and that the trust was at an end. The

bank set up in defense the existence of an adverse claim of title by the Soviet Republic, and the danger that this claim might be upheld in France and in other countries where the Soviet decrees were recognized as law. We held that in a suit in equity, there is discretion, if not duty, to refuse a decree whereby a trustee will be directed to make payment of the subject of the trust to one of two claimants unless there is power also by force of the same decree to protect against the rival (*Mahr* v. *Norwich Union Fire Ins. Co.*, 127 N. Y. 452). The rule is different altogether in actions at law (*Chapman* v. *Forbes*, 123 N. Y. 532; *Bauer* v. *Dewey*, 166 N. Y. 402). Here in the case before us the subject of the controversy is not property burdened with a trust to be administered in equity. The subject is an ordinary deposit in a bank to be sued for, if at all, in an action founded on the debt. In actions of that order, a refusal to pay when due is not sustained without more by the presence of an adverse claim. The defendant, if unable to interplead, must respond to the challenge, and defend as best it can (*Coler* v. *Corn Exchange Bank*, 250 N. Y. 136, 145; *Newhall* v. *Longacre Bank*, 248 N. Y. 252, 254; *Scheffer* v. *Erie County Sav. Bank*, 229 N. Y. 50, 53).

The argument is pressed that the danger of double liability supplies the basis for an equitable defense, if not for any other. The danger is not imminent, as the course of events since our decision in *Russian Reinsurance Co.* v. *Stoddard* (*supra*) sufficiently attests. France recognizes the Soviet Republic as a member of the family of nations. Yet, till now at least, it has failed to give effect to titles having their basis in decrees of confiscation (cf. Wohl, Nationalization of Joint Stock Banking Corporations in Soviet Russia, 75 U. of Penn. Law Rev. 385, 392, 395, with citation of French authorities). But in actions at law, the danger, whatever it may be, is no defense at all, whether equitable or legal. An equitable defense is one of such an order as would once have been enforced by the

Court of Chancery through the remedy of an injunction restraining the prosecution of the remedy at law (*Susquehanna S. S. Co., Inc.*, v. *Andersen & Co., Inc.*, 239 N. Y. 285, 292). The Court of Chancery did not enjoin the prosecution of a legal action because of the possibility of adverse claims unless the circumstances were such as to sustain a bill of interpleader. The defendant does not and cannot interplead the Soviet Republic. That being so, it must wage the battle for itself. Negligible is the risk that by any judgment in its domicile it will be compelled to pay again. Whatever risk it runs abroad, is one that it assumed as part of the business of a bank. " The chance of double payment is a common risk of life " (*Coler* v. *Corn Exchange Bank, supra,* p. 145).

The case comes down to this: A fund is in this State with title vested in the plaintiff at the time of the deposit. Nothing to divest that title has ever happened here or elsewhere. The directors who made the deposit in the name of the corporation or continued it in that name now ask to get it back. Either it must be paid to the depositor, acting by them, or it must be kept here indefinitely. Either they must control the custody, or for the present and the indefinite future it is not controllable by any one. The defendant expresses the fear that the money may be misapplied if the custody is changed. The fear has its basis in nothing more than mere suspicion. The directors, men of honor presumably, will be charged with the duties of trustees, and will be subject to prosecution, civil or criminal, if those duties are ignored. The defendant is not required to follow the money into their hands and see how they apply it. Its duty is to pay.

The judgment of the Appellate Division and that of the Trial Term should be reversed and judgment directed in favor of the plaintiff for $66,749.45 with interest from December 21, 1920, and costs in all the courts.

CRANE, LEHMAN, KELLOGG and HUBBS, JJ., concur; POUND and O'BRIEN, JJ., dissent.

Judgment accordingly.