Argued April 4, affirmed November 14, 1951, petition for rehearing denied July 3, 1952

## PETERS ET AL. *v.* McKAY ET AL.

238 P. 2d 225
246 P. 2d 535

*Peter A. Schwabe,* of Portland, argued the cause for appellants. On the brief were Francis E. Sturgis, of Hillsboro, and Haas & Schwabe, of Portland.

*Cecil H. Quesseth,* Assistant Attorney General, of Salem, argued the cause for respondents. With him on the brief was George Neuner, Attorney General, of Salem.

BRAND, C. J.

The petitioners, as the Dutch heirs of Herman Trebas, deceased, seek a refund and distribution to them in equal shares of the net proceeds of the decedent's estate which was turned over by the administrator to the State of Oregon as an escheat. The defendants, acting as the State Land Board, moved to quash the service of the petition. The motion was allowed and the petitioners appeal.

The facts alleged and material to the decision are as follows: Petitioners are first cousins of Herman Trebas, deceased, and his heirs at law. Herman Trebas was born in Germany and died in Beaverton, Oregon, 22 July 1928. The petitioners were born and live in Holland and are citizens of that country. Their ages are stated. The estate of Herman Trebas was administered in Washington County, Oregon. The administrator filed his final account on 12 January 1932 and on 15 February 1932 the county court of Washington County ordered the administrator to pay to the defendants, as the State Land Board, the net clear proceeds of the estate, consisting of $8,232.76. The order was based upon a finding ''that the administrator had been unable to find whether there were

any heirs of said decedent and that said decedent left no known heirs." The money was paid to the State Treasurer on behalf of the State Land Board on 14 April 1932. The petitioners had no knowledge or notice of the administration proceedings and no knowledge of the escheat proceedings and did not learn of the death of the decedent "for a long time after the entry of said order escheating said estate." On 1 July 1946 each of the petitioners verified and filed a joint petition for refund of the escheated estate. It is the sufficiency of this petition which is now in issue.

In addition to the facts above stated, the petition of July 1946 also alleges the filing on 8 April 1942 of a petition by the same parties seeking the same relief, which petition "by this reference is incorporated herein and made a part of this present petition", and which, with the exception noted, is substantially identical to the one now before the Court. The first petition contained one allegation not found in the second one, as follows: "That ten years have not elapsed since the payment of the proceeds of this escheated estate by the administrator thereof to the State of Oregon, which payment was made on April 14th, 1932." It will be observed that the quoted allegation was true as of the date of the first petition, for ten years had not then elapsed. In place of the allegation that ten years had not elapsed, the pending petition substitutes the following:

"By reason of World War II and the invasion and capture of the Kingdom of The Netherlands by Germany, all means of communication and postal and mail deliveries were cancelled between The Netherlands and the United States as the United States itself was at war with Germany and as The Netherlands was also at war with

Germany and was an enemy occupied country, and therefore no communication by or with these plaintiffs and their agents or attorneys in the United States was possible; for the reasons herein stated these petitioners' petition was verified for and on their behalf by Geo. Powell, the duly appointed and acting Vice Consul of the Kingdom of The Netherlands with jurisdiction of the State of Oregon.

"* * *

"That your petitioners herein as soon as advised of these facts and at the earliest possible date after the restoration of postal facilities and without any unreasonable delay, and in compliance with the decision of the Court in said case numbered 12394 are now therefore hereby filing this said petition, verified by each personally and in person."

The petition further alleges:

"That your petitioners are citizens and inhabitants of the Kingdom of Holland, also known as The Netherlands, and that there exists a reciprocal right upon the part of citizens of the United States to take or inherit property within the Kingdom of Holland/The Netherlands, and to recover, by payment to them within the United States, funds originating from estates of persons dying within said Kingdom."

The Oregon statute authorizing suit for refund of an escheated estate provides that within ten years after payment to the State Land Board "a person * * * may file a verified petition * * * showing his claim or right to the property escheated * * *." The complaint alleges that the first petition of 1942 was filed within the ten years but was verified only by the attorney in fact of the plaintiffs and by the Vice Consul of the Kingdom of The Netherlands. Defendants filed a motion to quash the service of said first petition, which motion was allowed because the claimants had

not personally verified it. No appeal was taken from the order quashing the 1942 petition, and of course, the correctness of that order cannot be questioned here. We take it that the recital in the 1946 petition concerning the petition of 1942, and its disposition, is not made for the purpose of challenging the earlier order. Those recitals do, however, show that the pending issue is wholly different from the one presented on the first petition and that no question of res judicata is involved. The plaintiffs have each personally verified the pending petition. Notwithstanding the difference in the issue presented, the defendants followed the same procedure as before and moved to quash the service of the 1946 petition. The defendants' motion was supported upon three grounds as follows:

"1. That neither the State of Oregon nor said Governor, Secretary of State, and State Treasurer, as constituting the State Land Board, nor the State Land Board, can be sued without its or their consent, and that neither the State of Oregon nor the State Land Board has consented to be sued in the manner adopted or followed in said purported petition or followed by said purported petitioners herein;

"2. That the cause referred to in said purported petition was heretofore judicially determined by the above entitled court; and

"3. That more than 10 years have elapsed since the making of the judgment of escheat referred to by said purported petition."

The court quashed the service of the petition upon the ground that "a petition in the form required by the statute was not filed within the ten-year period * * *."

▪ Before discussing the important questions presented, it is proper to observe that there are obvious

defects in the pleading and procedure employed by both parties. Some of the allegations of the petition are lacking in definiteness. The method of incorporating the proceedings on the petition of April 1942 was perhaps irregular. On the other hand, the motion to quash, which was filed by the defendants, was not the proper way by which to test the definiteness or sufficiency of the petition. According to the established practice, the objection that the state has not consented to be sued is raised by demurrer to the petition, as shown by the following cases involving suits to recover escheated property: *Haley v. Sprague et al,* 166 Or 320, 111 P2d 1031; *Engle v. State Land Board,* 164 Or 109, 99 P2d 1018; and see *United Contracting Co. v. Duby,* 134 Or 1, 292 P 309. Notwithstanding these irregularities we are disposed to consider the case on its merits. The ruling of the trial court on the motion to quash gave to the plaintiffs no notice of formal defects with the usual opportunity of correcting them, which is accorded after a ruling on a motion to make more definite or on a demurrer. Again, as will appear, the allegations of the petition are amplified by facts judicially known to this court which need not be specially pleaded. *MacLeod v. United States,* 229 US 416, 57 L ed 1260; *State ex rel Bowles v. Olson,* 175 Or 98, 151 P2d 723; *Howe v. Kern,* 63 Or 487, 125 P 834, 128 P 818; *Parkersville Drainage Dist. v. Wattier,* 48 Or 332, 86 P 775; *Peterson v. Standard Oil Co.,* 55 Or 511, 106 P 337, 41 Am Jur, Pleading, § 9, p 293. In *Young v. State,* 36 Or 417, 59 P 812, 60 P 711, it was held that the strict rules of pleading do not apply to statutory proceedings to recover escheated property. Under the conditions here present, the petition must be construed most favorably to the plaintiffs. *McGilchrist v. Fiedler et al,* 155 Or 616,

65 P2d 388; *Keegan et al v. Lenzie,* 171 Or 194, 135 P2d 717. Counsel for the plaintiffs stated to this court that he had not raised the question as to the propriety of the motion to quash. Both parties agree that "The sole question", as stated by defendants, "is whether or not the Circuit Court erred in granting respondents' motion to quash service of the second petition on the ground that the statutory period prescribed by law for recovery of escheated property had run."

The petition of July 1946 was filed more than ten years after the payment of the funds to the State Treasurer. The statute provides:

"* * * within 10 years after payment of the proceeds of escheated personal property to the state land board, a person not a party or privy to such proceeding, nor having actual knowledge of the making of such judgment or order or of such payment to the state land board, may file a verified petition in the circuit court of the county where such information was filed, showing his claim or right to the property escheated or the proceeds thereof. Such petition shall be verified by the oath of the petitioner, whose age and place of residence shall be stated therein. It also shall state in substance that the petitioner lawfully is entitled to such property or proceeds, briefly describing the same; that at the time said property escheated to the state the petitioner had no knowledge or notice thereof; that said petitioner claims said property or proceeds as the heir or next of kin, setting forth the relationship of the decedent, who, at the time of his death, was the owner of same, and that 10 years have not elapsed since the making of the judgment or order escheating said property to the state, or since the payment of the proceeds of the escheated estate by the administrator thereof to the state land board pursuant to the order of

the court having probate jurisdiction. The state land board shall be made a defendant in said proceeding, and a copy of such petition must be served upon the clerk of said board at least 20 days before the hearing of the petition. The court must try the issue, as issues are tried in civil actions, with the aid of a jury, if requested by either party, and if it be determined that the petitioner is entitled to such property or the proceeds thereof, the court must order the same to be delivered to him * * *." OCLA, § 21-113 as amended by Oregon Laws, 1943, ch. 332.

Although the special statute for the recovery of escheats contains no provision therefor, the petitioners contend that the period of limitation was tolled by the war under OCLA, § 1-217 which provides:

"When a person shall be an alien subject or citizen of a country at war with the United States, the time of the continuance of the war shall not be a part of the period limited for the commencement of the action."

██ We hold that the provisions of OCLA, § 1-217 relate only to the tolling of statutes of limitation in actions against suable persons. None of the periods of limitation specified in Title 1, chapter 2, relating to limitation of actions, refer to the time within which an action may be brought against the state.

In *Burns v. White Swan Mining Co.*, 35 Or 305, 309, 57 P 637, an analogous situation was considered. It was held that the general statute of limitations can have no application in a suit to foreclose a mechanic's lien "which must be commenced within the time prescribed in the act creating the right, or the lien is irrevocably lost:" Similar reasoning would preclude any application of the general statute of limitations in a suit brought under the escheat statute. See also

*Nickerson v. Mecklem,* 169 Or 270, 126 P2d 1095, and *Gorny v. Milwaukie County Orphans Board,* 93 F2d 107, USCA 7th, 115 ALR 1000.

> "* * * Where a statute provides for restitution of escheated property only upon application made within a prescribed time, a general limitation statute is inapplicable to a suit instituted to recover such property. * * *" 19 Am Jur, Escheat, § 53, p 415.

Furthermore, the petitioners in the case at bar were not alien *subjects* or *citizens* of a country at war with the United States within the meaning of OCLA, § 1-217, supra, although, as will appear, they were in the position of alien enemies.

### THE INTERNATIONAL LAW ASPECT

■ The second contention of the petitioners is that the ten-year period of limitations in the escheat statute was suspended by war "as a matter of common law and international law" independently of OCLA, § 1-217, supra. This proposition presented issues of extreme delicacy which are entirely new to the jurisprudence of this and many other states. In the entire 189 volumes of the Oregon Reports, not a single case has been digested under the heading of International Law, yet, the rule is firmly established and uniformly recognized that "International law is a part of our law and as such is the law of all States of the Union (The Habana, 175 US 677, 700, 44 L ed 320, 328, 20 S Ct 290), but it is a part of our law for the application of its own principles, and these are concerned with international rights and duties and not with domestic rights and duties." *Skiriotes v. Florida,* 313 US 69, 85 L ed 1193, 1198. And see *Riddell v. Fuhrman,* 233 Mass 69, 123 NE 237; *Sears v. The Scotia,* 14 Wallace 170, 20 L ed 822. The rule has been briefly stated as follows:

"Unless there is some treaty or statute to the contrary, the law of nations is to be treated as part of the law of the land. The courts of all nations judicially notice this law, and it must be ascertained and administered by the courts of appropriate jurisdiction as often as questions of right depending upon it are duly presented for their determination. * * *" 30 Am Jur, International Law 178, § 7.

This brief statement is amplified by eminent authors in the field of international law:

"International law, as the local law of each State, is necessarily superior to any administrative regulation or statute or public act at variance with it. There can be no conflict on an equal plane. The precise relationship of a recognized rule of international law to a local statute in contravention thereof is oftentimes obscured by occurrences which take place before the superiority of the former is ultimately established. A local court may be obliged, on account of the nature and the limits of the powers conferred upon it, to enforce the statute; and even a domestic tribunal of last resort may be compelled to affirm such action. This merely signifies that no local forum is possessed of jurisdiction to pass upon the propriety of the conduct of the State in enacting the law; it does not imply that that conduct is internationally defensible, or that the judges approve of it. Moreover, the finality of the local adjudication does not indicate that the conflict has passed through more than a preliminary state. If the controversy be pressed further, through the diplomatic channel, the State whose enactment is denounced by another as at variance with international law may in fact deny the truth of the allegation. It cannot, however, admit the charge without acknowledging responsibility to make reparation. If disagreement as to the nature of the statute or the extent of the harm produced by it proves incapable of adjustment by negotiation, and the issue be referred to an international tribunal clothed with requisite juris-

diction, it will denounce the statute (if deemed to violate international law) and formulate its award accordingly. Observance of the award by the delinquent State (possibly entailing amendatory legislation) will terminate the conflict and establish the supremacy of the international obligation." 1 Hyde, International Law, 2d rev ed, 16, § 5. See also 1 Hackworth, Digest of International Law, pp 24 to 39.

■ In essence, the rule appears to be that international law is a part of the law of every state which is enforced by its courts without any constitutional or statutory act of incorporation by reference, and while a court may be without jurisdiction to enforce international law in a given case by reason of some controlling statute, nevertheless, relevant provisions of the law of nations are legally paramount whenever international rights and duties are involved before a court having jurisdiction to enforce them.

■ This principle is the basis for the extraordinary rule which is applied by the courts in seeking to avoid any conflict between international and municipal statutory law. It is firmly established that courts, in construing a statute, will indulge a strong presumption that the legislature did not intend to violate international law and will read into a statute such qualification or exception as may be necessary to avoid apparent conflict. This they will do unless it unmistakably appears that a statute was intended to be in disregard of a principle of international law.

"* * * Accordingly, it has been held that an act of Congress ought never to be construed to violate the law of nations if any other possible construction remains. International law also forms a part of the law of the several states." 30 Am Jur, International Law, 179, § 7.

"If, however, the court has no option to refuse

the enforcement of legislation in contravention of principles of international law, it does not follow that in construing the terms and provisions of a statute it may not assume that such principles were on the national conscience and that the congressional act did not deliberately intend to infringe them. In other words, unless it unmistakably appears that a congressional act was intended to be in disregard of a principle of international comity, the presumption is that it was intended to be in conformity with it. It is with such a principle in mind that we now proceed to an examination of the legislation upon which the government relies." The Over The Top, 5 F2d 838, 842.

"It is important to observe, however, that States are not commonly disposed to defy by local statute recognized obligations imposed by international law, and that they are instinctively reluctant to admit that domestic enactments manifest such a design. * * * Normally, it is taken for granted that international law prevails throughout the domain of a State and will be respected in the course of all the activities of its several agencies. This is true in the case of the United States. Its tribunals, and in particular the Supreme Court, are reluctant to impute to the Congress or the Executive an intention to violate the law of nations. Moreover those tribunals, when unrestricted by statutory limitations, apply and enforce the principles of international law as a part of the law of the land." 1 Hyde, International Law, 2d rev ed 17, § 5.

"The statute should be construed in the light of the purpose of the Government to act within the limitation of the principles of international law, the observance of which is so essential to the peace and harmony of nations, and it should not be assumed that Congress proposed to violate the obligations of this country to other nations, which it was the manifest purpose of the President to scrupulously observe and which were founded upon the principles

of international law.'' *MacLeod v. United States,* 229 US 416, 434, supra.

In the light of the principles above stated, we will now consider the proposition that the ten-year limitation in the escheat statute was suspended by war as a matter of international law. We will approach the problem by degrees, and first, by the consideration of analogous rules.

The first question for consideration is whether, in a proper case, ordinary statutes of limitation which merely bar the remedy, may be tolled by war in the absence of any statutory provision to that effect. The leading case is *Hanger v. Abbott,* 6 Wallace 532, 18 L ed 939. In that case the plaintiff, a resident of New Hampshire, sued the defendant, a resident of Arkansas. The cause of action accrued in 1861 and before the outbreak of the Civil War. There was a three-year statute of limitations. The suit was brought in 1865 after the end of the war. Defendant pleaded the statute of limitations. The plaintiff replied that during the entire period from 6 May 1861 until 1 January 1865 all lawful courts of the state of Arkansas were closed as a result of the war, and that such period should not be taken as any part of the three-year limitation, and therefore plaintiffs alleged that they did commence their suit within three years. The court held first that:

> ''War, when duly declared or recognized as such by the war-making power, imports a prohibition to the subjects, or citizens, of all commercial intercourse and correspondence with citizens or persons domiciled in the enemy country. * * *'' *Hanger v. Abbott,* supra.

The court held further that rights of suit are only suspended during the war and are revived upon the

restoration of peace. The court pointed out that statutes of limitation are statutes of repose.

"* * * They proceed also upon the presumption that claims are extinguished whenever they are not litigated in the proper forum within the prescribed period, and they take away all solid ground of complaint, because they rest on the negligence or laches of the party himself. * * *" *Hanger v. Abbott,* supra.

After referring to the usual statutory provisions whereby the period of limitation is tolled, in the case of insanity and the like, the court conceded that "Cases where the courts of justice are closed in consequence of insurrection or rebellion, are not within the express terms of any such exception * * *." The court then said:

"Total inability on the part of an enemy creditor to sustain any contract in the tribunals of the other belligerent exists during war, but the restoration of peace removes the disability, and opens the doors of the courts. Absolute suspension of the right, and prohibition to exercise it, exist during war by the law of nations, and if so, then it is clear that peace cannot bring with it the remedy if the war is of much duration, unless it also be held that the operation of the statute of limitations is also suspended during the period the creditor is prohibited, by the existence of the war and the law of nations, from enforcing his claim. Neither laches nor fraud can be imputed in such a case, and none of the reasons on which the statute is founded can possibly apply, as the disability to sue becomes absolute by the declaration of war, and is a conclusion of law. 2 Wildm. Int. Law, 17. Ability to sue was the status of the creditor when the contract was made, but the effect of war is to suspend the right, not only without any fault on his part, but under circumstances which make it his duty to abstain from any such attempt. His remedy is suspended by the acts of the two

governments and by the law of nations, not applicable at the date of the contract, but which comes into operation in consequence of an event over which he has no control.

"* * *

"* * * Unless the rule be so, then the citizens of a state may pay their debts by entering into an insurrection or rebellion against the government of the union, if they are able to close the courts, and to successfully resist the laws, until the bar of the statute becomes complete, which cannot for a moment be admitted. Peace restores the right and the remedy, and as that cannot be if the limitation continues to run during the period the creditor is rendered incapable to sue, it necessarily follows that the operation of the statute is also suspended during the same period." *Hanger v. Abbott,* supra.

In *Brown v. Hiatts,* 15 Wallace 177, the plaintiff, a citizen and resident of Virginia, loaned money to the defendant, a resident of Kansas, in 1860. The defendant gave a mortgage on Kansas land, due on 29 May 1861. The war broke out on 27 April 1861. It was held that the period of the war must be excluded in the compilation of the time during which the statute of limitations ran against the action. The court said:

"Statutes of limitation, in fixing a period within which rights of action must be asserted, proceed upon the principle that the courts of the country where the person to be prosecuted resides, or the property to be reached is situated, are open during the prescribed period to the suitor. The principle of public law which closes the courts of a country to a public enemy during war, renders compliance by him with such a statute impossible. As is well said in the recent case of Semmes v. Hartford Insurance Company, 'The law imposes the limitation and the law imposes the disability. It is nothing, therefore, but a necessary legal logic that the one period should be taken from the other.'"

The case of *Metropolitan National Bank of New York City v. Gordan,* 28 Ark 115 (1872) is of special interest. The plaintiff brought suit in the Arkansas court on a contract dated 16 April 1860 and payable in the city of New Orleans ten months after date. Suit was brought on 6 March 1872. The defendant pleaded the statute of limitations. The plaintiff replied that she was a citizen of the state of New York and that the courts of Arkansas were closed from 1861 to 1865 by reason of the war. Judgment in the lower court was for the defendant. Upon appeal the Arkansas Supreme Court referred to the case of *Bennett v. Worthington,* 24 Ark 487 which had held that when a statute of limitations once begins to run no subsequent disability will stop it and that the court could make no exception which was not provided for in the statute and that since the closing of the courts in time of war was not covered by a statutory exception the statute of limitations continued to run during the war. This case was expressly overruled on the authority of *Hanger v. Abbott,* supra. After reviewing other cases by the United States Supreme Court, the Arkansas court said that the United States Supreme Court seemed:

> "* * * with entire unanimity, to have fully settled the law that, under modern international law and commercial custom, upon the breaking out of a war, all contracts and rights between belligerents are suspended, and upon the restoration of peace the parties are restored to their rights and remedies as they existed at the commencement of hostilities."

The judgment of the lower court was reversed.

The foregoing decisions and many others have firmly established the principle of international law that war suspends the statute of limitations as to alien enemies residing in enemy territory and that the

rule suspending the running of limitations during the war is one of international law which the courts attach to or read into statutes of limitations though it is not expressed in them. The rule as stated is fully set forth by the annotator in 137 ALR at page 1454, and that text is supported by a great mass of federal and state decisions. Among other cases, see: *Ex parte Colonna,* 314 US 510, 86 L ed 379; *Freeborn v. The Ship Protector,* 9 Wallace 687, 19 L ed 812; *Levy v. Stewart,* 11 Wallace 244, 20 L ed 86; *Ross v. Jones,* 22 Wallace 576, 22 L ed 730; *Arnold v. Ellison et al,* 96 Pa Superior Ct (1929) 118; *Amy v. Watertown,* 130 US 320, 32 L ed 953; *H. P. Drewry, S. A. R. L. v. Onassis,* 42 NYS2d 74, 266 App Div 292; *Industrial Commission of Ohio v. Rotar,* 124 Ohio St 418, 179 NE 135; *Inland Steel Co. v. Jelenovic,* 84 Ind App 373, 150 NE 391; *Wall v. Robson,* 2 Nott & M'Cord 498 (SC 1820); *Porter v. Freudenberg,* 1 KB 857, 34 Am Jur, Limitation of Action, §§ 243, 244, pp 199 to 201; *Rothbarth v. Herzfeld,* 167 NYS 199, 179 App Div 865. And see *Salvoni v. Pilson,* 181 F2d 615.

## STATUTES CREATING AND LIMITING NEW RIGHTS

■ In the preceding discussion we were dealing with the suspension by war of ordinary statutes of limitation which affect the remedy rather than the right. *Evans v. Finley et al,* 166 Or 227, 111 P2d 833. We next consider the bearing of the rules of international law upon cases in which a statute has created a right and has fixed the time within which action upon that right must be brought. Such statutes generally contain no express provision for the suspension of the running of the limitation, and the common law rule is that the writ must affirmatively show that the action was brought

within the statutory period. *State ex rel v. Olson,* 175 Or 98, 151 P2d 723; *Rosell v. State Ind. Acc. Com.,* 164 Or 173, 95 P2d 726. Nevertheless, in the light of the principles of international law as above set forth, the courts have, as a matter of statutory construction, held that it was not the legislative intent to restrict the time within which an action may be brought, to the period limited in the statute when the law which authorizes suit within a given period of time also prohibits the bringing of such suit by reason of the intervention of war. In *Frabutt v. New York, Chicago & St. Louis R. Co.,* 84 F Supp 460, action was brought under the Federal Employers' Liability Act. A state of war existed between the United States and Italy from 11 December 1941 to 6 September 1947. On 31 December 1942 the workman suffered an industrial accident from which he died. The administrator sued for the benefit of the Italian widow on 12 July 1948. The statutory period within which suit could be brought was three years. The defendant moved for summary judgment upon the following grounds:

"1. That the Complaint fails to state a claim against defendant upon which relief can be granted.

"2. There is no allegation in the pleadings that this action was commenced within three years from the date the cause of action accrued."

Thus the objection was based, not only upon the lapse of the statutory period, but also upon the ground of a failure to plead that the action had been commenced within the required time. The court said:

"It appears by a firmly established principle of international law that the existence of a state of war between two countries or powers is effective to suspend the running of statutes of limitations as between the citizens of such countries or powers at

war, or, as it has been otherwise stated, war suspends the statute of limitations against alien enemies resident in enemy territory. On the restoration of peace all rights suspended during hostilities, or which remain dormant, are revived, and the statute of limitations again becomes operative. The rule suspending the running of limitations during war is one of international law which the courts attach to, or read into, statutes of limitations, though it is not expressed in them; and it is applicable irrespective of whether the limitation in the particular statute of limitations is considered to be a limitation of the right or liability, or of the remedy. * * *

"The reason for this modern rule lies in the fact that during the war the courts of either belligerent country are necessarily closed to the citizens of the other, since the law of nations forbids any intercourse between citizens of belligerent powers. Accordingly taking into consideration that statutes of limitations, in fixing a definite period for the bringing of suits, proceed upon the principle that the courts where the person to be prosecuted resides, or the property to be reached is situated, are open during the prescribed period to the suitor, and in view of the fact that the law of nations which closed the courts to alien enemies renders compliance with the statute impossible, it is only fair and just that the operation of statutes of limitations should be suspended; an alien enemy's right to sue being suspended by circumstances beyond his control, which, in fact, create a positive duty on his part to refrain from pursuing his right of action. 137 A. L. R. page 1454 et seq.; The Kaiser Wilhelm II, 3 Cir., 246 F. 786, L. R. A. 1918 C 795.

"* * *

"War can only end by treaty of peace between the belligerent countries, and while war continues the courts of each belligerent are closed to nationals of the other country. Statute of limitations will not

be permitted to run against an alien enemy. First National Bank of Pittsburgh v. Anglo-Oesterreichische Bank, supra; Siplyak v. Davis, 276 Pa. 49, 119 A. 745; Zeliznik v. Lytle Coal Co., 82 Pa. Super. 489; Borovitz v. American Hard Rubber Co., D. C. 287 F. 368.

"* * *

"The suspension of the remedy during war is so absolute that the courts could not have granted permission or authority to take testimony in the Republic of Italy which would have been an absolute necessity in order for the widow and her children to prosecute their right to recover. It, therefore, appears to me that when the reason for the suspension ceases, the right to prosecute revives and the fact that the right had been suspended in the war between United States and Italy should not constitute a disability or deprive the widow and children to recover if such right exists. To hold otherwise, the principles of the Constitution of the United States would be destroyed. It would be basically unsound and work a disallowance of the equal protection of the laws of this country to all persons, regardless of their previous condition of servitude or alienage.

"All statutes of limitations are based on the assumption that one with a good cause of action will not delay bringing it for an unreasonable period of time; but, when a plaintiff has been denied access to the courts, the basis of the assumption becomes destroyed."

In *Siplyak v. Davis,* 276 Pa 49, 119 A 745, the Austrian widow of a workman who was killed in an industrial accident brought a claim under the Pennsylvania Compensation Act. The statutory limit upon the right to sue was one year. A claim was filed after the expiration of one year. The court held that the statute limiting the right was tolled during the period of the war

between the United States and Austria. The court said:

"A further principle, however, is recognized by the courts, which is applicable to the present proceeding. In case of the existence of an emergency, such as the declaration of war, and the statute makes no provision for such emergency, it may be reasonably implied that, if the Legislature had had in mind such contingency, it would have made provision to meet it. This implied suspension of the statute may be justified on the ground of public necessity due to the fact, for example, that during the existence of war a total inability exists on the part of the citizens of the belligerent countries to carry on business intercourse with each other, and necessarily an absolute suspension of all rights and a prohibition to exercise them exists during that time, and, as this state of facts was brought about by circumstances over which the individual had no control, it is only fair that on termination of hostilities and the declaration of peace both the right and the remedy therefor should be returned to the parties.

"* * *

"We find nothing in the recent federal legislation known as the Trading with the Enemy Act of October 6, 1917, 40 State. 411 (U. S. Comp. St. 1918, U. S. Comp. St. Ann. Supp. 1919, §§ 3115 ½ a-3115 ½ ff, 3115 ½ g-3115 ½ j), which in any way indicates an intention of Congress to change the existing law applicable to dealings between citizens of the United States and those countries with which we were at war. On the contrary, section 8 of that act (section 3115 ½ dd), dealing with contracts with the enemy and providing for the suspension of the statute of limitations between parties neither of whom was an enemy, or an ally of an enemy, contains the express provision that—

"'Nothing herein contained shall be construed to prevent the suspension of the running of the stat-

ute of limitations in all * * * cases where such suspension would occur under existing law.'

"Here is an express recognition of the fact that under existing laws the statute is suspended as between American citizens and the citizens of other countries, who were neither an enemy, nor an ally of an enemy, but against or in favor of whom the existence of war naturally made it difficult to enforce contractual or other obligations."

Other cases supporting the same rule are as follows: *Borovitz v. American Hard Rubber Co.,* ·287 F 368; *Colorado Fuel & Iron Co. v. Industrial Commission,* 73 Colo 579, 216 P 706; *Industrial Commission of Ohio v. Rotar,* supra, 124 Ohio St 418, 179 NE 135; and see The Kaiser Wilhelm II, 246 F 786, CCA 3d (1917).

## THE LIMITATION IN CONSENT STATUTES

■ Having considered the effect of war as suspending the operation of statutes which limit the remedy and of other statutes which ordinarily limit or terminate the right, we now approach one step closer to the immediate issue. The Oregon statute authorizing suit to recover escheated property within ten years presents a situation similar to both of the two categories considered above, but not identical to either. Since the escheat statute in legal effect authorizes a suit against the state, it is, of course, a "consent" statute. Being such, the legislature could impose terms and conditions upon those in whose favor it yielded the needed consent. The question, however, as to the scope of the conditions imposed, is one of statutory construction based on a consideration of the legislative intent and it is to be resolved in the light of the extraordinary conditions created by war. Unlike the cases under statutes such as the Workmen's Compensation Act in which a new right is both created and limited, the statute concerning

petitions for refund of escheats "does not create a new right or a new cause of action." *Haley et al. v. Sprague et al.*, 166 Or 320, 325, 111 P2d 1031. The statute merely enables a purported heir to sue the state for recovery of property which he claims he owns. The construction of the limitation in the consent statute presents an issue more closely resembling that involved in the cases in which it is held that war tolls ordinary statutes of limitation. In both, the right exists. In one the remedy is limited by a legislative mandate; in the other, the period within which the state consents to be sued is so limited. No reason is perceived why the court should not adopt a uniform rule of construction for both statutes when the intervention of war is asserted as ground for suspension of the running of the limitation. It is true that there is no provision in the consent statute for the suspension thereof, but the same is true concerning the cases in which it is held that war suspends statutes which create rights unknown to the common law and which limit both right and remedy. When the state consents to be sued, and then by reason of its recognition of rules of international and common law, closes its courts to the litigant, thereby denying the privilege which it granted, some construction must be sought which will avoid absurdity. It is unbelievable that the same hand which gives should also be construed to take away. The law does not follow the precedent of the nursery rhyme, "Hang your clothes on a hickory limb, but don't go near the water."

■─■ In construing the escheat statute it must be frankly conceded that the general rule is that the legislative intent must control; that such intent is ordinarily to be found from the phraseology of the statute; and that consent statutes, being in derogation of sovereignty, are generally construed with reasonable strict-

ness. *Cary v. Metropolitan Insurance Co.,* 141 Or 388, 17 P2d 1111; *Title & Trust Co. v. Wharton,* 166 Or 612, 114 P2d 140; *Federal Land Bank v. Schermerhorn,* 155 Or 533, 64 P2d 1337. However, the issue here must be determined by the application of other rules of construction equally well established. In the leading case of *Fox v. Galloway,* 174 Or 339, 148 P2d 922, this court in an opinion by Mr. Justice BAILEY, an authority on statutory construction, said:

"* * * The cardinal rule of statutory construction is to ascertain the meaning of the legislature and give it effect, if such meaning is constitutional. In determining the intent many things are taken into consideration: the language used, the object to be accomplished, whether a literal interpretation of the language will lead to an impossibility or an absurdity, the history behind the act, and numerous other matters, no one of which is absolutely controlling as to the legislative intent. It is from a combination of all these that the intent is deduced * * *.

"* * * *

"When, however, a literal application of the language produces an absurd or unreasonable result, it is the duty of the court to construe the act, if possible, so that it is a reasonable and workable law and not inconsistent with the general policy of the legislature: Othus v. Kozer, 119 Or. 101, 248 P. 146; State v. Hay, 132 Or. 223, 283 P. 753; Portland Van & Storage Co. v. Hoss, 139 Or. 434, 9 P. (2d) 122, 81 A. L. R. 1136. 'It is a familiar rule that a thing may be within the letter of the statute and yet not within the statute, because not within its spirit nor within the intention of its makers': Holy Trinity Church v. United States, 134 U. S. 457, 36 L. E. 226, 12 S. Ct. 511; Staples v. Senders, 164 Or. 244, 261, 96 P. (2d) 215, 101 P. (2d) 232."

When, in the process of statutory construction,

the legislative intent is not manifest, courts may properly seek the intent by considering the subject matter, the necessity for the law, the circumstances under which it was enacted, the mischief sought to be remedied and the objective to be attained. *Union Fishermen's Co. v. Shoemaker,* 98 Or 659, 193 P 476, 194 P 854; *State ex rel Hood River Hospital v. Employees' Hospital Ass'n et al,* 157 Or 618, 73 P2d 693; *Sunshine Dairy v. Peterson et al,* 183 Or 305, 193 P2d 543.

■ This court has frequently held that a statutory construction which would lead to unreasonable or absurd results should be avoided. *State ex rel v. Dobson,* 169 Or 546, 130 P2d 939; *Nanny v. Oregon Liquor Control Com.,* 179 Or 274, 171 P2d 360. We have also held that when the legislative intent, in enacting a statute, has been ascertained, it should be given effect, although the literal meaning of the words used is not followed.

> "* * * The general language of the statute should be limited to the persons and subjects to which it is reasonable to suppose it was intended to apply, especially when a literal interpretation would lead to harmful and absurd consequences." *Allen v. Multnomah County,* 179 Or 548, 173 P2d 475.

■ It is not ordinarily necessary to inquire into the background matter relative to legislative intent when the language of the statute is clear. Nevertheless, this court, in a recent opinion by Mr. Justice Rossman has pointed out that even this rule may be subject to exceptions.

> "* * * The courts hold that even if an act is expressed in clear language, a conclusion may be warranted that an ambiguity exists if literal interpretation will produce an absurd result or one at variance with the policy of the legislation as a whole: United States v. American Trucking Assn.,

310 U. S. 534, 84 L. Ed. 1345, 60 S. Ct. 1059; Fox v. Galloway, 174 Or. 339, 148 P. 2d 922.'' *Gouge v. David et al,* 185 Or 437, 455, 202 P2d 489.

And in *Fish v. Bishop,* 176 Or 210, 213, 156 P2d 204, this court, by Mr. Justice LUSK, said:

"* * * But if, by a fair and reasonable interpretation of the words of the statute, a result so nonsensical can be avoided, then it is equally our duty to adopt that interpretation, for, while the procedure which the appellant contends must be followed might excite the admiration, if not the envy, of Dickens' Circumlocution Office, it is not to be presumed that it has commended itself to the wisdom of the legislative assembly.''

The court then quoted with approval:

" 'All laws should receive a sensible construction. General terms should be so limited in their application as not to lead to injustice, oppression, or an absurd consequence. It will always therefore be presumed that the Legislature intended exceptions to its language which would avoid results of this character. The reason of the law in such cases should prevail over its letter.' '' *Fish v. Bishop,* supra, at 213.

While these decisions lead the way to a sound construction of the statute authorizing recovery of escheated property, none of them contain the compelling considerations which are present in the instant case and which lead to the conclusion that the running of the time limited for action in the consent statute should be suspended by war in a proper case in the same manner that all other statutes limiting either the remedy or the right are suspended.

In *Osborne v. United States,* 164 F2d 767, the plaintiff brought a libel against the United States of America and another, for injuries suffered through negligence of the defendants. When injured, the plain-

tiff was a member of the crew of a ship owned, operated and controlled by the defendants, the American President Lines, Ltd., and the United States through its agency, the War Shipping Administration. The defendants contended that the suit had not been filed within the two-year period of limitations permitted under the Suits in Admiralty Act, 46 U. S. C. A., § 745, or the three-year period under the Jones Act. The Suits in Admiralty Act is a "consent statute" authorizing libels *in personam* against the United States and is therefore generally strictly construed. U. S. C. A., § 742 and notes. Plaintiff was injured sometime between 15 October 1941 and 8 December 1941. On the latter date he was interned by the enemy and was returned to the United States only in October 1945. Suit was commenced on 31 July 1946. The United States District Court, "with reluctance," held that the action was barred. In reversing the judgment, the Circuit Court of Appeals said:

> "The question of whether the limitation period under the Suits in Admiralty Act or under the Jones Act should apply in this action does not concern us here, for if appellant's action is barred, it is barred under either statute. The question being moot, we do not pass upon it."

The court then expressly recognized the general rule that when a statute creates a cause of action unknown to the common law, the period of limitation is regarded as a matter of substance limiting both the right and the remedy. It stated that the rule had been applied to cases under the Federal Employers' Liability Act, the Jones Act and the Suits in Admiralty Act. It pointed out that suits under such statutes are not suspended by infancy or insanity as in the case of ordinary statutes of limitation. The case of the plaintiff, how-

ever, was distinguished by the fact that "throughout the period when he ought to have brought suit, the courts were unavailable to him as a prisoner in the hands of the enemy." The court then approved and applied the ruling of *Hanger v. Abbott,* supra, 6 Wallace 532, 18 L ed 939, as follows:

"The Hanger case has been consistently followed in the federal courts. Its doctrine has been applied not only where the plaintiff was a citizen of the United States, but also where he was an enemy alien during a war. It has also been applied where the statute of limitations was of the substantive type involved here, not the ordinary type as in the Hanger case, because the considerations for so tolling the ordinary statute apply also to the special type. State courts, facing the same problem in cases involving limitations provisions in wrongful death statutes, have held that the statute should toll for enemy aliens, despite silence on the subject in the statute itself.

"We see no reason why the Hanger doctrine should not govern here. The cases cited show there would be no doubt that a Japanese citizen employed as appellant was on the S. S. President Harrison would have been able to sue for similar injuries. It would seem the height of unreasonableness to grant such redress to one of our former enemies at the same time we denied it to a citizen who, through no fault of his own, was held prisoner by that enemy.

"Neither do we think that distinction should be made because of the type of statute of limitations involved. All statutes of limitation are based on the assumption that one with a good cause of action will not delay bringing it for an unreasonable period of time; but, when a plaintiff has been denied access to the courts, the basis of the assumption has been destroyed. Whatever the reasons for describing this type of statute of limitations as substantive rather than procedural—and we suspect the chief

reason was to make the period of limitation named in the statute, rather than that of the forum, control in cases brought in state courts—we think we do the distinction no violence by holding that either type of statute will toll for one who is a prisoner in the hands of the enemy in time of war.''

See also marginal annotations: *Osbourne v. United States,* supra, 164 F2d 767 at 769.

■ The Osbourne and Frabutt cases both received favorable comment in *Scarborough v. Atlantic Coast Line R. Co.,* 178 F2d 253, 259. In *Standard-Vacuum Oil Co. v. United States,* 80 F Supp 657, the plaintiff sued the United States under a consent statute. The court reviewed the holding of the Osbourne case with apparent approval, but distinguished it on the facts. One judge dissented upon the ground that there was no distinction of substance and that therefore the ruling of the Osbourne case should be applied. On the issue now being considered, it is pertinent to observe that in the case of *Siplyak v. Davis,* supra, 276 Pa 49, 119 A 745, the defendant was the Director General of Railroads during the first World War. We conclude that by reason of the principles of international law the courts of this country will treat as suspended the time limitation in a consent statute in a suit by an alien enemy during a period that the courts were closed to the claimant by reason of war. Limitation statutes of all types were enacted in contemplation of the prevalence of peace and the authorities indicate that consent to sue means consent to sue in a court which is open for suit. In the absence of an express and unequivocal declaration to that effect, we should not presume that the law both grants and withholds the permission to sue.

## THE POSITION OF THE PLAINTIFFS ·

Most of the cases thus far considered relate to suits by an alien enemy. The defendants contend that the claimants were subjects of the Kingdom of The Netherlands with which the United States was not at war, and that they were therefore not alien enemies. The Osbourne case, however, suggests the answer. In that case, the running of the statutory limitation was suspended for the benefit of an American citizen imprisoned by the enemy. As indicated in the Osbourne case, it would be the height of unreasonableness to grant redress to a Japanese alien enemy by reason of the war at the same time that we denied it to a citizen. The identical question was considered in a lengthy opinion in the House of Lords. In *Sovfracht v. Van Undens Scheepvaart,* All E. R., Vol. 1 (1943) 76, the court reviewed British and American decisions and held that a Dutch company, with principal place of business in Rotterdam, was in the position of an alien enemy as to whom the courts were closed by reason of the belligerent occupation of the Kingdom of The Netherlands by Germany during the second World War. In the course of a lengthy opinion, Viscount Simon, L. C., said:

"It is not irrelevant to bear in mind the reason why a resident in enemy-occupied territory is in certain circumstances subject to the same disability as a resident in enemy territory. Lord Reading, L. C. J., in Porter v. Freudenberg (1), referring to the denial to alien enemies of a right to sue, said at p. 867:

" 'This law was founded in earlier days upon the conception that all subjects owing allegiance to the Crown were at war with subjects of the state at war with the Crown, and later it was grounded upon public policy, which forbids the doing of acts which will be or may be to the advantage of the

enemy state by increasing its capacity for prolonging hostilities in adding to the credit, money or goods, or other resources available to individuals in the enemy state.'

"This consideration equally applies to a claim sought to be established in our courts by a resident in enemy-occupied territory, for, if the claimant succeeds, an asset in the form of an award or a judgment is created which the occupying power can appropriate and which is calculated to increase the enemy's resources."

We hold that, by reason of the belligerent occupation of the Kingdom of The Netherlands by Germany, the plaintiffs, who were residents within, and subjects of that kingdom, were in the position of alien enemies, and as such, were barred from bringing suits in the courts of this state, and that the same facts which closed the courts to them, also operated to suspend the running of the period of limitation for their benefit. The closing of the courts to persons in the position of alien enemies is not the only limitation upon their rights. From the Basic Field Manual, Rules of Land Warfare of the War Department of the United States, we read the following at Chapter 7, section 215, page 60:

"All intercourse *between the territories occupied by belligerent armies,* whether by traffic, by letter, by travel, or in any other way, ceases. This is the general rule to be observed without special proclamation." (Italics ours.)

The conclusion at which we have arrived is supported in the monumental work of Charles Cheney Hyde on International Law, Vol. 3, where he says, at page 1699:

"It is inconsistent with a state of war that the inhabitants within territory *controlled* by one belligerent should hold intercourse with those within

territory controlled by the enemy, primarily because of the danger of the communication of information of military or political value, and secondarily, because of the neutralizing effect of any commercial transactions tending to increase the resources of the enemy upon hostile operations undertaken against it. * * *'' (Italics ours.)

Again the author says at 1715:

"A consequence of closing the courts to a class of alien enemies is to remove from them certain penalties which might otherwise be incurred through failure to initiate proceedings during the period of disability. Thus the statute of limitations does not run against such individuals while they are being deprived of their judicial remedies."

In *H. P. Drewry, S. A. R. L., v. Onassis,* supra, 42 NYS 2d 74, 266 App Div 292, it was held that the plaintiff, a French corporation residing in France during the belligerent occupation of that state by Germany, should be considered an alien enemy under the Trading with the Enemy Act. The decision relied, not alone upon federal statute, but also upon English and American decisions. See also *Von Hofmannsthal v. Wolfe,* 93 NY Supp 2d 550, 276 App Div 223.

## THE PERIOD OF SUSPENSION

The final, and perhaps the most vexing question, remains for decision. We must determine between what dates the statute was suspended, and then deduct the period of suspension from the total period which intervened between the accrual of the cause of action and the institution of the present proceedings. We can then determine whether the net balance of time is more or less than ten years. The significant dates may be listed as follows:

| | |
|---|---|
| 14 April 1932 | Net proceeds of estate paid by the administrator to the State Treasurer for the State Land Board. On this date the 10-year statute began to run. |
| 8 May 1940 | Germany invades The Netherlands. |
| 11 May 1940 | The President of the United States proclaims the existence of a state of war between Germany and the Kingdom of The Netherlands. 54 US Statutes at Large, part 2, page 2703. |
| 18 May 1940 | Belligerent occupation of The Netherlands completed and supreme civil authority assumed by decree of Chancellor Hitler. Lemkin, Axis Rule in Occupied Europe, page 446; *Sovfracht v. Van Undens Scheepvaart,* supra. |
| 11 December 1941 | State of war between the United States and Germany declared by joint resolution of Congress. 55 US Statutes at Large, part 1, page 796. |
| 8 May 1945 | Unconditional surrender of the German armies in The Netherlands and the end of belligerent occupation. |
| 1 July 1946 | Plaintiffs' petition for refund of escheated estate was filed. |
| 31 December 1946 | The President of the United States proclaims the cessation of hostilities of World War II. |

■ In the plaintiffs' opening brief they were satisfied to contend that the period of suspension ended on or about 8 May 1945 when belligerent occupation ended and that thereafter the statutory limitation would

again run. In their reply brief, however, it is suggested that the period of suspension continued until 31 December 1946, the date of the President's proclamation that hostilities in World War II had ended. With this second contention we cannot agree. It is generally held that the courts of this country are closed to alien enemies who are citizens or subjects of a country at war with the United States and that they remain closed until the making of the treaty of peace, or at least until Congress, by joint resolution, declares the termination of the state of war. *Frabutt v. New York, Chicago & St. Louis R. Co.; Arnold v. Ellison et al; MacLeod v. United States; Inland Steel Co. v. Jelenovic; Colorado Fuel & Iron Co. v. Industrial Commission; Borovitz v. American Hard Rubber Co.; Industrial Commission of Ohio v. Rotar,* all supra. It is unnecessary to decide the disputed question as to whether war can be ended by unilateral act, or only by treaty, because the rule applicable to German citizens or subjects cannot be applied in the case at bar. The plaintiffs were subjects of the Kingdom of The Netherlands with which the United States maintained diplomatic relations. There could be no treaty of peace or declaration of the end of hostilities between the United States and the Kingdom of The Netherlands because the two countries were never at war. The courts were closed to the plaintiffs solely because of the fact that Germany was in belligerent occupation of their country. For the reasons explained in the cases, the plaintiffs were treated as alien enemies, but upon termination of the occupation, we find no reason for holding that communications between persons in The Netherlands and others in this country were forbidden or that the courts of this country were closed to the plaintiffs. Plaintiffs were in a position analogous to that of the plaintiff in

*Osbourne v. United States,* supra. The running of the statute was suspended for his benefit during his imprisonment by the enemy. No one would argue that the suspension continued after he was returned to the United States merely because the war with Japan had not ended. We hold that the suspension of the statutory period ended with the unconditional surrender of the German armed forces and the liberation of Holland on 8 May 1945.

Between 14 April 1932, when the statute commenced to run, and 1 July 1946 when the suit was filed, 14 years, 2 months and about 17 days had elapsed. From 11 December 1941 to 8 May 1945, that is, from the commencement of war between the United States and Germany until the liberation of The Netherlands, the running of the statutory period was clearly suspended. That period, however, amounts to only three years and a little less than five months. If that be the extent of the suspension, it would follow that the ten-year period had fully run before the complaint was filed. The plaintiffs' case therefore rests upon their contention that ''the period of suspension could certainly start no *later* * * * than sometime in May, 1940, when Germany invaded The Netherlands.'' If the running of the statutory limitation was suspended from 18 May 1940 until 8 May 1945, it would follow that the filing of the complaint was well within the ten-year period.

The plaintiffs rely upon several decisions from the courts of New York. They are, however, distinguishable from the cases which we have previously cited. In that state, the questions concerning the suspension of statutes of limitation by reason of war have been treated as strictly controlled by specific statute, leaving no room for construction. Before its amendment, to which we will later refer, section 27 of the Civil

Practice Act provided in substance that an alien subject or citizen of a country at war with the United States was under a "disability" and that the "time of the continuance of the disability is not a part of the time limited for the commencement of the action." But, it also provided, in section 28, that the "disability" must exist when the right of action accrued. In treating war as giving rise to a disability, the New York court arrived at a different construction from that applicable to OCLA, §§ 1-217 and 1-220, by reason of the difference in the wording of the New York and Oregon statutes. In *Nathan v. Equitable Trust Co.,* 250 NY 250, 165 NE 282, the New York court distinguished *Hanger v. Abbott,* supra, because the latter case was decided on the ground of international law and without reference to any statute. The court then held under the statute that the "disability" of war was like that of insanity and must exist when the cause of action accrued. Under this decision, if the statute of limitations once began to run, it continued, notwithstanding the intervention of war.

In *Gallewski v. Hentz & Co.,* 93 NY Supp2d 546, 276 App Div 219, on which the plaintiffs rely, the New York court again gave no consideration to the rules of international law. It pointed out that under the Nathan case, the duration of the war could not have been excepted from the limitation period except for the fact that sections 27 and 28 of the Civil Practice Act had been amended. The court held that the "amendatory act eliminated the previous requirement that the war shall have been in progress when the cause of action accrued, in order to toll the statute of limitations." The amendatory act was held applicable and the plaintiff, as administrator of one Gutmann who had been a citizen and resident of The Netherlands,

but who was arrested and deported by Germany during the occupation, was held to be one as to whom the statute of limitations was tolled. The 1949 amendment to section 27 provided that the period of war should not be a part of the time limited for the commencement of the action, "whether the cause of action arose during or prior to the period of such disability * * *." Laws of New York, 1949, ch 326. In 1949 the New York legislature also amended section 13 of the Civil Practice Act by adding the following with reference to causes of action arising outside of the state:

"* * * Where such cause of action, whether originally accrued in favor of a resident or non-resident, arose in a foreign country with which the United States or any of its allies was then or subsequently at war, or in territory then or subsequently occupied by the government of such foreign country, the period between the commencement of the war, or the occupation of such country, and the termination of hostilities with such country, or the termination of such occupation, is not a part of the time limited in this article for commencing the action * * *." Laws of New York, 1949, ch 855.

The plaintiffs rely upon *Von Hofmannsthal v. Wolfe*, supra, 93 NY Supp2d 550, 276 App Div 223. That case was decided upon the authority of the 1949 amendments above cited. In that case the court said:

"The chronology of events may briefly be summarized as follows: The claim arose in Austria on March 9, 1938. That country was occupied by Germany on March 11, 1938. The World War started on September 1, 1939. The United States entered the World War on December 8, 1941, and the action was commenced on May 11, 1949. The hostilities ended on May 8, 1945. The statute of limitations would be tolled for the period from September 1, 1939 to May 8, 1945, and this would be more than

sufficient to prevent the six-year statute of limitations from operating as a bar.''

Again we quote:

"'* * * It is clear from these amendments that the Legislature wanted to afford some measure of protection for a period arising before the United States entered the World War, i. e., from September 1, 1939. It is possible that it was the intention of the Legislature to extend the benefits of the tolling provisions to claims arising in what turned out to be enemy occupied territory even before that date, for example those arising in Austria during the Anschluss or after March 11, 1938. As has been stated, it is unnecessary to decide that last point on this appeal, for if we assume that the tolling period, for claims arising in enemy occupied countries, begins from the time that the first ally of the United States entered the war, that is, from September 1, 1939, the period of tolling is sufficient, in the instant case, to prevent the six-year New York statute of limitations from operating as a bar.''

Thus it appears that the case was decided strictly on the basis of special New York statutes without any consideration of the principles of international law. The 1949 amendments to the New York Civil Practice Act manifest an impressive legislative policy in favor of the general principles advocated by the plaintiffs in the case at bar. The amendment to section 17 of that act brought the legislative policy of the state into harmony with *Hanger v. Abbott,* supra, but, for our present purpose, the question is whether the 1949 amendment to section 13, supra, or the decisions thereunder, can be considered as declaratory of any rule of international law. The many cases which we have earlier reviewed establish the rule that a person residing in The Netherlands when it was in belligerent occupation by Germany is in the position of an alien enemy

from the outbreak of war between the United States and Germany until the liberation of The Netherlands. The New York statute went beyond the holdings of any of these cases when it provided for the suspension of statutes of limitation as to certain causes of action for a greater period, namely, for the period between the occupation of a country by a state with which the United States or any of its allies was then, or subsequently, at war, and the termination of such occupation. Furthermore, even if the New York cases were adopted as declaratory of rules of international law, they would not apply to the pending case. Section 13 of the New York Civil Practice Act refers to causes of action which arise outside of the state of the forum. The cause of action in the pending litigation arose in Oregon. The Von Hofmannsthal case is not in point.

The plaintiffs draw some comfort from language employed by Justice Brandeis in *Watts, Watts & Co. v. Unione Austriaca &c.*, 248 US 9, 63 L ed 100. In that case the controversy was between British and Austro-Hungarian corporations. The case was originally decided before 6 April 1917, the date on which the United States entered the first World War, but the final decision of the United States Supreme Court was made after that date. The Supreme Court took notice of the change of conditions which had occurred and held that by reason of such change of conditions, intercourse was prohibited between subjects of Austria-Hungary who were then alien enemies, and persons in the United States. The suit was continued until the restoration of peace. In addition to the ruling on the illegality of such intercourse, the court said: "And we take notice of the fact that free intercourse between residents of the two countries has been also physically impossible." It is one thing for a court to take judicial notice of the fact

that free intercourse was physically impossible between two countries which are at war, but it would be quite another thing for this court, in the pending case, to take judicial notice of the impossibility in·fact of intercourse between a resident subject of The Netherlands and persons in the United States after the belligerent occupation of The Netherlands by Germany and before the United States declared war on Germany. There is nothing in the Watts case which indicates that physical impossibility of intercourse with persons in the United States because of war conditions in a foreign country would toll a domestic statute of limitations when the United States was not involved in any such war, and we find no judicial support for any such rule.

In *Sadowski v. Hubbard Steel Foundry Co.,* 100 Ind App 233, 193 NE 676, an action was brought under the Workmen's Compensation Act. There was a two-year statute of limitations. For reasons which are not clear, the court held that the application was not filed within two years after the death of the decedent, which occurred on 23 January 1919. The defendant pleaded the statute of limitations to which the plaintiffs filed a reply closely resembling the pleading of the plaintiff in the case at bar. It alleged that the plaintiff was at all times a resident of Poland, and that "at the time of her husband's death and since said time has the State of Poland been engaged in war and been the scene of war. That as a consequence it was impossible to communicate with private persons in this country." The armistice which provided for the evacuation of occupied countries and which ended hostilities of World War I was signed on 11 November 1918, before the death of the workman. It seems clear that the plaintiff

could not have been deemed an alien enemy at the time the cause of action accrued. The court said:

"We deem it expedient to note that appellants attempted to prove the allegations of their second paragraph of reply which allegations are set forth herein, and to note that appellants contend that the facts so alleged and proven suspend the operation of the statute of limitations against appellant Karolina Sadowski, and to note that appellants cite Inland Steel Co. v. Jelenovic (1925), 84 Ind. App. 373, 150 N. E. 391, as authority for their said contention. In that case this court held 'that war suspends the operation of the statute of limitations against *alien enemies residing in enemy territory.'* In the cause at bar appellants did not allege nor attempt to prove that appellant Karolina Sadowski was an 'alien enemy residing in enemy territory' at any time during the two years immediately following decedent's death, and therefore the case of Inland Steel Company v. Jelenovic, supra, is not applicable here."

This case appears to be authority for the proposition that the physical impossibility of commercial intercourse by reason of the existence of a state of war does not suspend statutes of limitations or close the courts of this country except when the war is one in which the United States is involved and the litigant is in the position of an alien enemy.

In *Siplyak v. Davis,* supra, the court referred to section 8 of the Trading with the Enemy Act of October 6, 1917, 40 Stat. 411 (U. S. Comp. St. 1918, U. S. Comp. St. Ann. Supp. 1919, §§ 3115½a - 3115½ff, 3115½g - 3115½j). The statute provided for the suspension of the statute of limitations in certain contract cases, and then provided:

"Nothing herein contained shall be construed to prevent the suspension of the running of the statute

of limitations in all * * * cases where such suspension would occur under existing law.''

After quoting the above provision, the court said:

''Here is an express recognition of the fact that under existing laws the statute is suspended as between American citizens and the citizens of those countries with which we were at war, but would not be suspended between our citizens and the citizens of other countries, who were neither an enemy, nor an ally of an enemy, but against or in favor of whom the existence of war naturally made it difficult to enforce contractual or other obligations.''

██ A careful search has failed to discover any act or declaration of the legislative or executive branches of this government of which we could take judicial notice and which forbade communications by mail between subjects of the Kingdom of The Netherlands and persons in this country prior to December 1941 when the United States declared war against Germany. In the earnest search for any record of which we might take judicial notice, we directed an inquiry to the State Department in the following words:

''Is there a record of any official proclamation or declaration by the State Department of the United States concerning the impossibility in fact or law of communications or intercourse by citizens of The Netherlands with persons within the United States or with neutral countries in general, during the period of the belligerent occupation of The Netherlands and prior to the declaration of war between the United States and Germany?''

An answer signed, ''For the Secretary of State'' by the Acting Legal Adviser, stated that parcel post shipments to The Netherlands were suspended 21 May 1940, but that ''there were no official statements of the Department concerning communication between Ameri-

can citizens and residents of The Netherlands.'' We are reluctantly forced to the conclusion that, although the belligerent occupation of The Netherlands by Germany, prior to the entry of the United States into the war, probably did render communications with the United States difficult in fact, nevertheless, there was no law rendering such communication illegal and there is no reason to believe that the courts within the United States were closed to the plaintiffs during the period in question. It follows that, although the statutory limitation was suspended from 11 December 1941 to 8 May 1945, the ten-year period had fully run before the suit was commenced on 1 July 1946.

It is of interest to note that in a case now pending in the District Court of Appeal of California, the Attorney General of the United States has filed a brief as amicus curiae which supports the legal conclusions at which we have arrived. The legal issues in that case are the same as here, though the facts are different. *In the Matter of the Estate of Gerasimos Caravas,* California District Court of Appeal, 3 Civil No. 7985.

The case at bar is one of great hardship, and, we fear, some injustice. There is little equity in the claim of the defendants. The plaintiffs, with due diligence, filed their first complaint within the ten-year period, and the service in that case was quashed upon highly technical grounds. However, we are unable to find any rule of international law which would extend the limitation of the statute for a period long enough to warrant a holding in favor of the plaintiffs. The remedy, if any there be, must rest with the legislature. The order of the trial court is affirmed. Neither party will recover costs.

ON REHEARING

*Haas & Schwabe,* of Portland, for the petition.

*George Neuner,* Attorney General, and *Cecil H. Quesseth,* Assistant Attorney General, both of Salem, contra.

BRAND, C. J.

The plaintiffs have filed a petition for rehearing in which a new contention is made, based upon facts which were not pleaded or proven in the circuit court or brought to the attention of this court until said petition was filed. Under these circumstances, the court might well refuse to give consideration to such new matter at this late date. *In re Shepherd's Estate,* 152 Or 15, 45, 41 P2d 444, 49 P2d 448; *Paine v. Meier & Frank Co.,* 146 Or 40, 53, 27 P2d 315, 29 P2d 531. Owing, however, to the importance of the questions involved in this litigation, we have given to the plaintiffs unprecedented extensions of time within which to prepare their petition and brief and to secure properly authenticated copies of the documents on which they rely.

With commendable candor, counsel for the plaintiffs have prefaced their brief on petition for rehearing with the following statement:

"Counsel for appellants feel that they owe and at the outset of this brief should express to this Court their apologies and an explanation for not having heretofore raised and argued the points discussed in this brief. The explanation * * * is that they did not, at the time of their previous presentation and argument of this case, know of

the Royal Decree No. A-1, issued by the Royal Government of the Kingdom of The Netherlands on May 24, 1940, which decree is, we think, determinative of this case.''

The circumstances tend to exonerate counsel of any charge of negligence in failing to present The Netherlands Royal Decree at an earlier time. It appears that its existence was not known until the opinion of this court was brought to the attention of the embassy of The Netherlands in Washington, D. C. While not required to do so, we will now give consideration to the effect of that decree.

The action was brought by the plaintiffs, or petitioners, as the Dutch heirs of Herman Trebas, deceased, seeking a refund to them of the net proceeds of the decedent's estate which was turned over by the administrator to the state of Oregon as an escheat. The facts are fully stated in our original opinion. The original petition was filed in 1942 but it was held invalid for the specific reason as stated by the trial court, that the petition was not signed and verified by any of the claimants. The second petition was filed on 1 July 1946 under the provisions of OCLA, § 21-113, as amended by Oregon Laws 1943, chapter 332. The statute, as set forth in the code, and as amended, authorizes certain persons to sue the state to recover escheated property ''within 10 years after payment of the proceeds of escheated personal property to the state * * *.'' The trial court held that the 10-year statutory period of limitation had run before the second petition was filed. Only one assignment of error was made in appellants' original brief on appeal, namely:

''The Court erred in not holding that the ten year statutory period of limitation was tolled by war.''

We held that the statutory limitation was suspended by war from 11 December 1941 to 8 May 1945 but that the 10-year period had fully run before the suit was commenced on 1 July 1946. The first assignment of error in plaintiffs' petition for rehearing is as follows:

"The Court erred in taking December 11, 1941, the date of the declaration of war by the United States of America upon Germany, as the commencement date of the period of tolling the ten year limitation upon the filing of the refund petition. Such commencement date was correctly not later than May 24, 1940."

A true translation of the official text of The Netherlands Royal Decree of May 24, 1940, duly certified by the Minister Plenipotentiary in The Netherlands embassy at Washington, D. C., has been submitted to us. The contents of the decree may also be found in *Anderson v. N. V. Transandine Handelmaatschappij,* 289 NY 9, 43 NE2d 502. The relevant portions thereof are as follows:

"'(1) Title to claims against persons, partnerships, companies, corporations, firms, institutions and public bodies, which claims belong to natural or legal persons domiciled in the Kingdom of the Netherlands, * * * in so far as these claims are in any form whatsoever capable of being encumbered, pledged, transferred or sold or the like, outside the Realm in Europe, is hereby vested in the State of the Netherlands, as represented by the Royal Netherlands Government, temporarily resident in London and exercising its functions there * * *.'

"* * * * *

"'(3) The proprietary rights vested in the State of the Netherlands, by virtue of the provisions of the preceding paragraphs, shall only be exercised for the conservation of the rights of the former owners.' * * *"

The plaintiffs contend that their claim and "their right to make and file a petition for refund of this escheated estate were vested as of May 24, 1940, in the State of The Netherlands by the Royal Decree * * *." They contend further that by virtue of the decree of 24 May 1940 they were prevented from asserting and enforcing their right "by a paramount authority, that is the Government of the State of The Netherlands * * *." Their argument is that whenever some paramount authority prevents a person from exercising his legal remedy, the time during which he is thus prevented is not to be counted against him in computing the period of limitation. Cases are cited in support of that general proposition. Plaintiffs' conclusion is, therefore, that the running of the 10-year statute limiting the right to sue was suspended from 24 May 1940, the date of the Royal Decree.

It will be observed that under the Royal Decree, certain claims of persons domiciled in The Netherlands were vested in the State of The Netherlands, but only "so far as these claims are in any form whatsoever capable of being encumbered, pledged, transferred or sold or the like." Let us see if the claims of the plaintiffs were capable of being encumbered, pledged, transferred or sold or the like. The statute providing for the recovery of escheated property, as enacted in 1903, merely provided that within ten years a person may file a petition "showing his claim or right", and "if it be determined that such person is entitled to the proceeds" the court shall direct that they be delivered to him. LOL, §§ 73-74.

In *Engle v. State Land Board*, 164 Or 109, 99 P2d 1018, the plaintiff, as administratrix of the estate of Helena Pettingill, brought an action under the statute to recover escheated funds. The defendants demurred

upon the ground, among others, that the plaintiff was without legal capacity to institute the proceeding. The court pointed out that the act of 1903, to which we have referred, did not require the claimant to state the relationship, or that he claim the property as heir or next of kin. The court then called attention to the amendment of 1927, Oregon Laws 1927, chapter 281, which required that the petition be verified by the claimant; that his age and place of residence be stated; and that it be alleged that the petitioner made his claim as heir and next of kin, setting forth the relationship. The court said:

"* * * On the contrary, the legislature purposely foreclosed the right of the administrator and the creditors of the deceased owner to participate in the proceeds of the recovery; and by requiring the petitioner to verify the claim, to disclose his age and place of residence, to state in the petition that he claims as heir or next of kin of the former owner and to set forth his relationship to such owner, the legislature plainly withheld from a personal representative of a deceased heir or next of kin the right to institute such a proceeding."

The court quoted with approval from many authorities to the effect that the legal title of the state to escheated property can be divested only in the mode and by the persons designated by law, and that no person can take advantage of a statute protecting the rights of heirs unless he was a legally qualified heir at the time of his ancestor's death. The court pointed out that since the statute was one giving legislative consent, on the part of the state, to be sued, "Any terms or conditions, thus prescribed, apparently are jurisdictional facts, and must be fully complied with. Consequently suit cannot be maintained against a state, unless plaintiff is a person, or among the class of

persons, to whom the state's consent has been granted; * * *." The foregoing was quoted by the court from 59 CJ, States, § 461. It was held that suit by an administratrix had not been authorized by the statute and that the defendant's demurrer should have been sustained.

In *Wood et al. v. Sprague et al.,* 165 Or 122, 106 P2d 287, the plaintiffs, as heirs of a deceased person, brought action to recover moneys alleged to have escheated to the state. Referring to the language of the statute which authorizes such actions, the court said:

"* * * it re-enforces the view that the legislature had in mind only an action by heirs to recover property which, in one or the other of those modes, had been adjudged escheat and had come into the hands of the state treasurer pursuant to an order or judgment in such a proceeding."

*Engle v. State Land Board,* supra, was cited and approved.

A similar problem was before the court in *Haley v. Sprague et al.,* 166 Or 320, 111 P2d 1031. An action was brought to recover escheated funds by the plaintiffs who were heirs of the decedent. The administrator of two of the deceased heirs was joined as a party plaintiff. The defendants demurred to the complaint upon the following grounds: (a) That the administrator lacked legal capacity to sue; (b) defect of parties plaintiff; (c):

" 'several causes of action have been improperly united, to wit, the cause of action of each one of the plaintiffs with one another and the said administrator of two separate estates with different interests and with other plaintiffs'; (d) 'the plaintiffs have not nor has any one of them legal capacity

to sue inasmuch as the plaintiffs, respectively, have not filed a verified petition.' ''

The trial court overruled the demurrer and gave judgment for the plaintiffs. Upon appeal, this court held that ''The demurrer should have been sustained to the causes of action presented by Decker'', who was the administrator, citing *Engle v. State Land Board,* supra. The judgment in favor of the other plaintiffs was affirmed. It was held that several heirs may join in an action to recover escheated funds. Concerning the statute, the court said further:

''* * * Section 21-113, in our opinion, is a consent statute—it grants the state's consent to be made a party defendant in actions of this kind. One who is an heir at law, within the purview of our Statutes of Descent and Distribution, of a decedent whose estate is held by the state as an escheat would be in a position to maintain an action against the state for the property if the state were suable. When this action was instituted, the ordinary rules of pleading, practice and evidence would outline the procedure to be followed. But the state can not be made a defendant without its consent. The constitution or a statute must yield the state's consent, otherwise the state can not be made a defendant. Section 21-113 serves the purpose just mentioned; it grants the needed consent. But, since the state was not compelled to grant its consent, it was in a position to exact conditions of and impose terms upon those in whose favor it yielded the needed consent. Exercising those privileges, § 21-113 states the circumstances under which an heir may recover an estate in the possession of the state land board, the time within which he must begin his action, and the manner in which he must serve the state with notice of the fact that he has commenced an action. We are satisfied that § 21-113 is a consent statute. The few instances in which items of procedure are prescribed in the act obviously were

prompted by a legislative belief that in those specific instances a course different from the usual one was desirable. Wherever those passages exact a course of practice different from the usual, their demands must, of course, be followed. In all other instances the common rules which govern pleading, practice and evidence in actions for the recovery of property must be followed. * * *''

The court recognized that it was necessary for one of the heirs as plaintiff to verify the complaint, but held that the requirement had been complied with.

██ ██ Under these decisions, it is clear that OCLA, § 21-113 as amended, must be treated as a consent statute, the terms and conditions of which must be fully complied with, and that the right which is created by the statute is personal to the heirs and next of kin of the deceased and can be enforced by no other person, not even by the administrator of an heir. It follows that the claims of the heirs were not capable of being ''encumbered, pledged, transferred or sold or the like'' and they were therefore never vested in the State of The Netherlands by virtue of the Royal Decree or otherwise. The obvious purpose of the Royal Decree was to prevent the property and rights of persons living in The Netherlands territory occupied by the Germans from falling into the hands of the enemy. Since the claims can be enforced in this state only by the heirs, and upon a petition verified by an heir, and since the heir must, by such petition, show his claim of right as an heir, it follows that the claim of the plaintiffs, under our statute, to recover an escheat, was neither within the letter nor the intent of the Royal Decree because such action was unnecessary for the protection of the Dutch heirs. An assignment by the Dutch heirs, either to the Royal Netherlands government, or voluntarily to a third party, or involuntarily

to a German enemy, would have carried with it no right enforceable in this state under our statute.

The plaintiffs rely upon *Anderson v. N. V. Transandine Handelmaatschappij,* supra, 289 NY 9, 43 NE2d 502. In that case the plaintiff, an assignee of a foreign claimant, brought an action for damages against the defendants who were subjects of the State of The Netherlands. Attachments issued against property in the state of New York alleged to belong to the defendants. The State of The Netherlands intervened claiming that the property attached had been vested in, and belonged to it, by virtue of the Royal Decree. The petition of the intervener was sustained and the attachment was vacated. The case was carried to the Court of Appeals and was affirmed. The court said:

> "The certification by the State Department that the Government of the United States has recognized the Royal Netherlands Government in England as the government of the State of the Netherlands constitutes a determination of political questions concerning the legitimacy of that government and its decrees. Guaranty Trust Co. of New York v. United States, 304 U.S. 126, 58 S.Ct. 785, 82 L.Ed. 1224. The scope and the effect within this State of a decree promulgated by the recognized government are judicial questions, just as the scope and effect of the law of any long-established and recognized friendly foreign government, like that of England, would be judicial questions. The certification was not intended to withdraw from the court jurisdiction or right to determine those questions, just as it would decide other judicial questions, without advice or suggestion from the political branch of the government."

In the Anderson case the property attached was of a character which was capable of being encumbered, pledged, transferred or sold or the like and it therefore

came squarely within the terms of the Royal Decree. In the pending case the plaintiffs' rights against the state of Oregon were personal to them as heirs, and could be enforced only by them. The Royal Decree had no effect upon the plaintiffs' title.

■ The plaintiffs contend that statutes of limitation are suspended when paramount governmental authority intervenes to prevent the enforcement of a right within the time limited. *St. Paul, Minneapolis & Manitoba Ry. Co. v. Olson,* 87 Minn 117, 91 NW 294; *Johnson v. Johnson,* 182 Okl 293, 77 P2d 745. An Oregon statute recognizes this principle by providing . that "When the commencement of an action is stayed by injunction or a statutory prohibition, the time of the continuance of the injunction or prohibition shall not be a part of the time limited for the commencement of the action." OCLA, § 1-218. But the authorities which give this effect to paramount governmental authority have reference to acts of the state where the right is to be enforced. Plaintiffs' contention that the "paramount authority" of a statute of a foreign country would suspend the running of a statutory limitation of the state of Oregon presents a far different question, one which we need not consider, since the Royal Decree did not apply to the plaintiffs' claim.

■ The plaintiffs also, for the first time, refer to two executive orders of the President of the United States as tending to show that the plaintiffs were prevented thereby from asserting their rights from and after 10 May 1940. If the executive orders did prohibit the filing of plaintiffs' claim as contended, a serious question would be presented, but the orders had no such effect. The first order, No. 8389, of 10 April 1940, did not apply to persons in The Netherlands. The second, No. 8785, was issued by the President on 14

June 1941, with a provision therein that the effective date as to such persons should be 10 May 1940. This order applied to persons in The Netherlands. It prohibits certain transactions with reference to the transfer of banking credits, foreign exchange, gold and the like, except as authorized by the Secretary of the Treasury, but the order does not prohibit communication by mail between The Netherlands and the United States, nor does it include within the scope of its prohibitions the mere act of filing a complaint for refund of proceeds of escheated property or for any other purpose. The order has no relevance in this case.

The plaintiffs contend, at least by implication, that we should have held that the running of the statutory limitation was suspended, commencing on 10 May 1940 when Germany invaded The Netherlands, because of the difficulties involved in communicating between The Netherlands and the United States after that date. We gave full consideration to that matter in our previous opinion. We held that the running of the statutory limitation was suspended on 11 December 1941, the date of our declaration of war upon Germany. We conceded that "the belligerent occupation of The Netherlands by Germany, prior to the entry of the United States into the war, probably did render communications with the United States difficult in fact", but we added that we could find no law indicating that communication prior to that date was illegal or that American courts were closed to the plaintiffs during that period. In their petition for rehearing the plaintiffs have submitted a communication from the Acting Assistant Postmaster General of the United States which we think supports our original conclusion. We quote:

"* * * You ask whether any official notices

were issued by this Department which would reflect the status of mail service with the Netherlands during the periods prior to December 11, 1941, and subsequent to May 8, 1945.

"There were no such official notices issued prior to December 11, 1941, which was the date of the Order which suspended all mail service to the territories occupied by Germany, including of course the Netherlands. * * *"

He acknowledges, as did we, that in fact, delivery of mail was frequently obstructed and delayed, but it is clear from his statement, that mail service was not suspended until the entry of the United States into the war. Since we have held that the running of the statutory limitation was suspended by war on 11 December 1941, the prohibition of communication by mail only after that date adds nothing to the plaintiffs' case. All of the matters presented in the petition for rehearing, with the exception of the contentions based upon the Royal Decree and the executive order of the President of the United States, received full consideration in our first opinion. We adhere to the views therein expressed. The petition for rehearing is therefore denied.